**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Richard Daniel FREEMAN, Robert Temp**
**and Alaine Carter Temp,**
**Defendants-Appellants.**

No. 79–5044.

United States Court of Appeals,
Fifth Circuit.

June 25, 1980.

Steven M. Kipperman, Jeffrey S. Ross, San Francisco, Cal., John Wilson Reed, New Orleans, La., for Temp & Temp & Freeman.

Le Roy Morgan Jahn, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before VANCE, POLITZ and RANDALL, Circuit Judges.

VANCE, Circuit Judge:

Richard Daniel Freeman, Robert Temp, and Alaine Carter Temp appeal their convictions in a jury trial for mail fraud, 18 U.S.C. §§ 1341 and 2, and for interstate transportation of fraudulently taken property, *id.* §§ 2314 and 2. They raise numerous challenges to the indictment, evidentiary rulings, the jury instructions, other trial events, and the cumulative effect of these alleged errors. We affirm.

## I. THE FRAUDULENT SCHEME

Freeman and Mr. Temp entered an agreement in 1970 with Walter Wilson Carter, Jr., who also was indicted, but testified for the government. Freeman and Temp would locate and deal with California investors, primarily physicians and other professional persons, through Temp's business, Diversified Monetary Systems, Inc. (DMS). Carter would obtain and operate the oil and gas properties through his partially owned corporation, Independence Drilling Corp. (IDC). DMS induced the investors to enter purchase acquisition contracts with IDC for oil property leases, workover contracts, and remedial work on the wells. DMS, itself, entered financial management contracts with the investors for a substantial annual fee. DMS sent the purchase amounts and workover charges to Carter, who acquired the leases and arranged for necessary remedial work.

Because Carter's operations lost money, Temp and Freeman formed Continental Pacific Corp. (CPC) in 1972, with Temp as president. CPC took over all production operations and investor records by contract with IDC. Mrs. Temp [1] established and ran the CPC office in Texas; she approved all correspondence, read all incoming mail, and reviewed the accounting books. Mr. Temp moved from California to Texas in 1973 to oversee the field work with Carter and to take part in running CPC and IDC.

IDC owned around 100 leases on oil and gas property at a time. The appealed convictions arise from the sale to investors of seven leases that Carter, IDC, and CPC never owned, although Carter had negotiated to buy them. Between July 1971 and December 1974 Freeman and, in a few cases, Mr. Temp sold those seven leases for a total of $767,447.99 to about forty-five investors. Mrs. Temp knew of these sales and prepared the paperwork accompanying the leases sent to the investors. In connection with the nonowned leases appellants also charged investors workover fees of $814,610.00 purportedly to maximize the petroleum production, and sent completion letters to the investors even though appellants did not expend that money on those particular properties. Mrs. Temp directed preparation of the completion letters. In fact, IDC and CPC commingled all the investors' funds in the general operating fund and apparently arbitrarily fixed net production returns to approximate the investors' payments on loans incurred in buying the leases. Appellants sent the investors production reports on the seven nonowned wells, although some did not produce oil or gas and none of the product accrued to the investors' benefit.

The superseding indictment charged Freeman, Mr. Temp, Mrs. Temp, and Carter with sixteen counts of mail fraud and twelve counts of interstate transportation of fraudulently taken property. After a five-week trial, the jury convicted all three appellants of eight counts of mail fraud and seven counts of interstate transportation; it also convicted Mr. Temp and Mrs. Temp of one other count of mail fraud and one of interstate transportation. The mail fraud convictions were based on transmission through the mail of production memoranda and another document about the nonowned properties from IDC to four investors in 1974 and 1975. The interstate transportation convictions were based on transfer of checks for interests in the nonowned properties from four investors to IDC in 1973 and 1974.[2]

## II. THE INDICTMENT

Appellants argue that the indictment did not charge an offense and that it lacked the necessary specificity. They did not raise these objections in the court below. Their contention that the indictment did not charge an offense may still be raised, Fed. R.Crim.P. 12(b)(2), but it is without merit. The indictment charged that appellants

---

1. Alaine Carter Temp actually was Alaine Carter until 1976, when she married Mr. Temp, but is referred to for uniformity's sake as Mrs. Temp.

2. One interstate transportation count involved oil property that was owned. Freeman was not convicted on that count.

made false, fraudulent, and misleading statements that IDC owned or operated several nonowned leases and would spend the workover charges on those specific lease interests to produce income for the investors, and it alleged that appellants sold those nonowned leases to the investors and failed to apply the workover charges to those properties. The indictment also listed particular mailings to those investors and check transfers across state lines from those investors. In assessing the sufficiency of the indictment, we reprint appellants' own summary of the first count of the indictment in the margin [3] and refer to it in the remainder of this section.

The essential elements of an indictment for mail fraud, 18 U.S.C. § 1341, are "(1) a scheme to defraud (2) which involves a use of the mails (3) for the purpose of executing the scheme." *United States v. Kent*, 608 F.2d 542, 545 (5th Cir. 1979). *See United States v. Maze*, 414 U.S. 395, 399, 94 S.Ct. 645, 647, 38 L.Ed.2d 603 (1974). The indictment need not specifically charge, but the government must prove, "a specific intent to commit fraud," *United States v. Kent*, 608 F.2d at 545 n. 3, and that "the thing mailed was an integral part of execution of the scheme," *id.* at 546. The present indictment in count one clearly alleged a scheme to defraud in paragraphs 1 and 3; use of the mails in paragraph 2(*o*) and in each mail fraud count; and the purpose of executing the scheme in each mail

---

3. The first count of the indictment contains the underlying facts for each alleged instance of mail fraud and interstate transportation of fraudulently taken property. It is incorporated by reference in the other 27 counts each of which lists a specific alleged offense. The following is appellants' summary of count one:

¶1 – Defendants devised [and intended to devise] a scheme to defraud by false pretenses, representations, and promises. Investors would be induced to pay for "turnkey drilling" or "workover" contracts and for alleged working interests in oil/gas leases.

¶2 – Part of the scheme [was:]

    (a) 6/23/70 – [Mr.] Temp and Freeman incorporate DMS [to sell investment interests in oil and gas leases].

    (b) 8/26/70 – Carter incorporates IDC [to engage in oil and gas production].

    (c) 7/70 – Temp/Freeman/Carter begin offering the leases, and

    (d) [investors executed] the management agreement, and

    (e) investors executed lease purchase contracts and workover contracts,

    (f) usually paying with bank loans.

    (g) 8/26/70–10/31/72 – IDC operated the leases purportedly producing or trying to produce petroleum[.]

    (h) 10/27/72 – Temp forms CPC[.]

    11/1/72 – CPC takes over production and workover operations from IDC[.]

    (i) 2/73–date – Temp personally directs all CPC and IDC operations[.]

    (j) 2/24/73 – Mrs. Temp becomes a Director and officer of CPC and begins shared management responsibilities with [Mr.] Temp.

    12/17/73 – Mrs. Temp is [serving as] Director/Officer of DMS[.]

    (k) 12/17/73 – DMS buys Ardmore Partners, Inc.

    (l) 1/15/74 – Freeman buys ECC, a wholly owned subsidiary of DMS, from DMS[.]

    (m) 12/31/74 – Ardmore changes its name to ECC[.]

    (n) 7/30/74 – Temp becomes principal shareholder of IDC[.]

    (o) [unspecified] – IDC/CPC/Defendants have caused correspondence and documentation [regarding] the investment contracts [and] false/misleading production reports to be sent in the mail to lull and cause prior and prospective investors to invest and reinvest[.]

    (p) 1970–date – [Defendants caused] investor monies [to be:]

    1 used to make purported production payments,

    2 com[m]ingled and used for general operating expenses [of IDC, CPC, and DMS, and]

    3 diverted to [other] corporate and personal uses.

¶3 – Part of the scheme [to defraud was] making false/misleading statements, representations, promises [knowing at the time that said statements, representations, and promises were false, fraudulent, and misleading when made,] *including but not limited to*

    (a) IDC owned/operated the seven unowned leases

    (b) workover monies would be spent on those seven leases

    (c) workover contracts would result in increased production and provide specified amounts of income[.]

[¶4 – One instance of interstate transportation of fraudulently taken property.]

fraud count.[4] The mail fraud counts of the indictment are therefore sufficient.

■ The essential elements of an indictment for interstate transportation of fraudulently taken checks (or similar property), 18 U.S.C. § 2314 (paragraphs 1 and 2), are (1) interstate transportation of a stolen, converted, or fraudulently taken check of at least $5,000 value (2) with fraudulent intent. *See United States v. Driscoll*, 454 F.2d 792, 797 (5th Cir. 1972). The present indictment in each interstate transportation count alleged (1) interstate transportation of a fraudulently taken check for more than $5,000 and (2) fraudulent intent in terms of "wilfully and knowingly caus[ing the check] to be transported in interstate commerce" and "knowing the same to have been taken by fraud."[5] The interstate transportation counts of the indictment are therefore sufficient. The aiding and abetting allegations, 18 U.S.C. § 2, within those same counts are similarly sufficient.

■ Appellants' contention that the indictment lacked the specificity required by the sixth amendment was waived by their failure to object before trial. *United States v. Varner*, 437 F.2d 1195, 1197 (5th Cir.), *cert. denied*, 404 U.S. 825, 92 S.Ct. 52, 30

L.Ed.2d 52 (1971) (mail fraud); Fed.R. Crim.P. 12(f). Even if they could object for the first time at this late date, we would reject their argument that the indictment's reference to particular events that "included, but were not limited to, the following" vitiated the indictment, *United States v. Caine*, 441 F.2d 454, 456–57 (2d Cir.), *cert. denied*, 404 U.S. 827, 92 S.Ct. 59, 30 L.Ed.2d 55 (1971) ("among others"), although the district court should have treated that language as surplusage, *Marsh v. United States*, 344 F.2d 317, 322 (5th Cir. 1965) ("the following and other offenses"); *see* Fed.R.Crim.P. 7(d). We also disagree with appellants' argument that "any of several acts conceivably underlay the Grand Jury's indictment," because that argument "confuses the Defendants' constitutional right to know what offense is charged with his need to know the evidentiary details establishing the facts of such offense" that can be provided through a motion for bill of particulars. *Van Liew v. United States*, 321 F.2d 664, 670 (5th Cir. 1963) (emphasis omitted).

■ Appellants also charge that all twelve jurors may not have found proof of any particular fraudulent scheme, *see Unit-*

---

4. A typical mail fraud count is count two, which realleges the allegations of count one, and charges that

   On or about May 21, 1973, in the Western District of Texas, Defendants
   WALTER WILSON CARTER, JR.
   ROBERT TEMP
   RICHARD DANIEL FREEMAN
   and
   ALAINE CARTER TEMP
   aided and abetted by each other for the purpose of executing the aforesaid scheme and artifice to defraud, and to obtain money by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, wilfully and knowingly caused to be placed in an authorized depository for mail matter, an envelope addressed to Mr. Phil Milano, 939 Detroit Avenue, Concord, California 94520, which envelope contained a seven-page oil and gas lease production report issued by Independence Drilling Corporation for the month of March, said envelope and contents to be sent and delivered by the United States Postal Service, in violation of Title 18, United States Code, Sections 2 and 1341.

5. A typical interstate transportation count is count one, which charges that

   On or about December 10, 1973, in the Western District of Texas, Defendants
   WALTER WILSON CARTER, JR.,
   ROBERT TEMP,
   RICHARD DANIEL FREEMAN,
   AND
   ALAINE CARTER TEMP
   aided and abetted by each other for the purpose of executing the aforesaid scheme and artifice to defraud and to obtain money by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, wilfully and knowingly caused to be transported in interstate commerce from the State of California to San Antonio, Texas, a check dated December 5, 1973, drawn on the account of Carl A. Ball, Jr., at the Security Pacific National Bank, made payable to Independence Drilling Corp., in the amount of $36,000, knowing the same to have been taken by fraud, in violation of Title 18, United States Code, Sections 2 and 2314.

ed States v. Gipson, 553 F.2d 453, 457–58 (5th Cir. 1977), but that some jurors might have found a single scheme while other jurors found a multiple conspiracy, see United States v. Nettles, 570 F.2d 547, 551–52 (5th Cir. 1978). Appellants did not raise their objection at trial, but contend that the court's failure to give jury instructions requiring unanimous agreement on one scheme was plain error. See United States v. Cook, 586 F.2d 572, 579 (5th Cir. 1978), cert. denied, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979); Fed.R.Crim.P. 30, 52(b). The instructions, however, required both that a guilty verdict be unanimous and that all essential elements be present "with respect to a particular count" of mail fraud or "with regard to a particular count" of interstate transportation of fraudulently taken property. Unlike the elements of 18 U.S.C. § 2313 in Gipson, the elements of each offense in this case do not fall into "two conceptual groupings" so that some jurors may have "thought the defendant committed only an act in the first conceptual grouping while others believed he committed an act only in the second." 553 F.2d at 458. The hearsay instructions that referred to a "conspiracy or scheme," which we discuss below, uniformly contemplated only a single combination.

■■■ Freeman, Mr. Temp, and Mrs. Temp also argue that "this court cannot say that the offense proved was the offense charged," and that the trial court "amended the indictment and permitted conviction of conspiracy that was not charged." The argument fails, however, because the indictment charged appellants with selling nonowned leases and collecting workover amounts for them, a charge that was supported by proof at trial, and the convictions were based on counts detailing the implementation of that scheme. Also, as in United States v. Baldarrama, 566 F.2d 560 (5th Cir.), cert. denied, 439 U.S. 844, 99 S.Ct. 140, 58 L.Ed.2d 145 (1978), "defendants completely failed to demonstrate any prejudice arising out of a possible variance between the offenses proved at trial and those charged in the indictment. Variance from the indictment is not always prejudicial, nor

is prejudice assumed." Id. at 566. The trial judge did not effectively amend the indictment by including instructions about conspiracy, because, as discussed in Part V infra, appellants themselves proposed instructions using the term conspiracy and clearly agreed to use of that term.

## III. EVIDENTIARY RULINGS

■■■ Appellants argue that admission of certain testimony of Cliff Miller, the former president of CPC, violated the attorney-client privilege. See Fed.R.Evid. 501. Citing pages 1801–1810 of the transcript, appellants assert that Miller testified that Stephen Nye, the attorney for Mr. Temp, CPC, DMC, and IDC instructed him during January 1974, when he was president of CPC, to hide some of IDC's corporate records in a warehouse before the SEC enforced a subpoena in its investigation of CPC and IDC. The transcript reveals, however, that the jury had retired from the courtroom and that the testimony specifically cited by appellants was not given in the jury's presence. After the jury returned to the courtroom, Miller affirmed that he had met with Carter, Mr. Temp, and Nye in January 1974 and testified generally that an upcoming Securities and Exchange Commission investigation had been discussed. He named Mr. Temp as the person who had given him his orders. When asked whether Mr. Temp had given him any instructions as to any corporate records, he replied,

> Yes, we went to Independence Drilling Corporation and removed two boxes of tax records from I.D.C. and removed them, Bob Temp and I removed them to an office, I mean a garage, rather, about four or five or six blocks from the office that we had for a motorcycle shop.

In his testimony before the jury, Miller revealed no confidential communications. Miller's statement that he and Mr. Temp moved boxes of corporate records is the revelation of an act in which he participated, not of a confidential disclosure. "An attorney's involvement in, or recommenda-

tion of, a transaction does not place a cloak of secrecy around all the incidents of such a transaction." *In re Fischel*, 557 F.2d 209, 212 (9th Cir. 1977). *See generally United States v. Pipkins*, 528 F.2d 559, 562–63 (5th Cir.), *cert. denied*, 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976). We find no error in the admission of Miller's testimony.

Appellants also challenge the district judge's rulings in admitting coconspirator declarations, testimony about securities law violations, impressions of witnesses, and letters from investors. They disagree with exclusion of some intent evidence and some diary pages.

■ Freeman, Mr. Temp, and Mrs. Temp argue that the court improperly admitted hearsay statements of each appellate against the others before their membership in a conspiracy was established by independent evidence. This circuit's decision in *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), did not govern the instant trial, because *James* applies only to conspiratorial statements offered in trials commencing after March 14, 1979, *id.* at 583, and this case was tried in 1978. Instead, our earlier decision in *United States v. Apollo*, 476 F.2d 156 (5th Cir. 1973), governed this case. The district court properly applied *Apollo's* rule that "[t]estimony concerning the declarations of co-conspirators may be admitted before the existence of the conspiracy is established by independent evidence" if the court's instructions "condition the minds of the jurors so that . . . none of this hearsay will bootstrap the necessary establishment of the conspiracy itself by firsthand proof." *Id.* at 163 (emphasis omitted). *See also* Part V *infra*.

■ Appellants contend that the trial court should not have admitted their former attorney's testimony about a desist and refrain order from the California corporations commissioner prohibiting them from selling leases without qualifying under state law and about the attorney's correspondence with the California commissioner. The attorney sought to show appellants' good faith in selling leases by testifying that they qualified the investment packages under the California securities law. The prosecution attempted on cross-examination to controvert their good faith by showing that appellants actually consulted that attorney only after they received a desist and refrain order from the California commissioner against their sales of unqualified securities. *See* Fed.R.Evid. 404(b). Appellants objected to use of the California order and correspondence to lead into testimony about an Oklahoma action brought by the Securities and Exchange Commission and a consent decree that ensued. *See United States v. Cook*, 557 F.2d 1149 (5th Cir. 1977), *cert. denied*, 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 767 (1978) (as direct evidence). They withdrew any further objection after the prosecution did not discuss the SEC action and the trial judge ruled the consent decree inadmissible. Appellants cannot now raise their objection, because the district judge did not commit plain error or any error at all in admitting evidence of the desist and refrain order. *See United States v. Cook*, 586 F.2d at 579; Fed.R.Evid. 103.

■ Freeman, Mr. Temp, and Mrs. Temp contend that admission of the testimony of three former employees of CPC and IDC violated the restriction on opinion evidence. Two witnesses testified about their "impression" and "understanding" of appellants' relationship to each other and to the different companies, and the third gave his opinion about whether a consultant actually had run tests on an oil well. Federal Rule of Evidence 701 limits lay testimony to "those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." Fed.R.Evid. 701. The challenged testimony falls within that exception; and the district judge did not abuse his discretion in admitting it. *See, e. g., United States v. Mandujano*, 499 F.2d 370, 379 (5th Cir. 1974), *cert. denied*, 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975) (witness' "understanding").

Appellants suggest that three letters written by investors or their attorneys were hearsay, unauthenticated, or irrelevant. The first letter was prepared and sent to Carter by the attorney of a DMS investor, Dr. Maurice Fox, from information supplied to him by Fox after meeting with Carter and Mr. Temp. It was sufficiently authenticated by Fox's testimony. *See* Fed.R.Evid. 901. It was properly admitted as showing the existence of investor complaints and, because Mrs. Temp screened Carter's mail, as weakening appellants' defense of ignorance and good faith. The second letter was sent from Fox to Carter in January 1976. It was relevant because it was written in response to a completion letter of October 1975 that fell within the scope of the indictment. The final letter was purportedly written by an investor, who did not testify, in response to an IDC letter, and was used to cross-examine Mr. Temp concerning his defense of good faith. *See generally, e. g., United States v. Bibbs*, 564 F.2d 1165, 1168–69 (5th Cir. 1977), *cert. denied*, 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388 (1978). It was not hearsay because it was not offered to prove the truth of its contents.

Appellants challenge exclusion of their proffered evidence of intent. (1) They sought to introduce a book on oil property investments given to investors. The court excluded the book as irrelevant when the investor who testified that he was given the book also stated that he had told Freeman that he would not have time to read it. The court erred in refusing to admit the book because presenting copies to investors was relevant to good faith, but the error was harmless beyond a reasonable doubt. *See* Fed.R.Evid. 103(a). Freeman and Mr. Temp both testified that they gave copies to each investor, so the "essence of desired evidence [was] before the jury," and "any harm in the original exclusion was eliminated." *See United States v. Sanfilippo*, 581 F.2d 1152, 1155 (5th Cir. 1978). (2) Appellants offered Mr. Temp's testimony about his conversation with Carter's father and an attorney regarding the purchase of IDC. The trial judge properly excluded

this testimony as irrelevant to intent because the 1976 conversation occurred two years after the purchase. (3) Appellants attempted to introduce a compromise agreement with some creditors after presenting the supporting testimony of the creditors' trustee. The court below properly found the agreement irrelevant to appellants' intent because it was entered two years after the alleged fraud terminated. *See United States v. Powers*, 467 F.2d 1089, 1096 (7th Cir. 1972), *cert. denied*, 410 U.S. 983, 93 S.Ct. 1499, 36 L.Ed.2d 178 (1973).

They also object to exclusion of pages from the business diary kept by Carter and regularly sent to Mrs. Temp. The district court concluded that the diary pages were unauthenticated because appellants refused to call Carter for that purpose even though he was available. The diary pages, however, were sufficiently authenticated by Mrs. Temp. *See United States v. White*, 444 F.2d 1274, 1280 (5th Cir.), *cert. denied*, 404 U.S. 949, 92 S.Ct. 300, 30 L.Ed.2d 266 (1971); Fed.R.Evid. 901(a), 901(b)(1) & (2). They were relevant to her testimony of Carter's activity in preparing production reports and completion letters. The exclusion of the diary pages was error harmless beyond a reasonable doubt, however, because they did not absolve Mrs. Temp or the other appellants from responsibility and knowledge regarding the production reports and completion letters, but merely inculpated Carter. *See* Fed.R.Evid. 103(a).

## IV. TRIAL EVENTS

Appellants contend that the district court failed to recognize a conflict of interest that denied them the effective assistance of counsel. The district judge inquired extensively during their arraignment into possible conflicts of interest from joint representation, and appellants knowingly and intelligently executed written waivers of objection to any conflict. *See United States v. Garcia*, 517 F.2d 272, 278 (5th Cir. 1975). Appellants allege that conflicts arose subsequently because Carter's testimony might have hurt one appellant

more than others, one appellant might have impeached the others, and the extrajudicial statements of one appellant might have been used against the others. Appellants' waiver extended to the first two, if not all three, of these alleged conflicts because they were evident during the arraignment discussion. *See Gray v. Estelle*, 574 F.2d 209, 213–14 (5th Cir. 1978). The third alleged conflict, as well as the others, was only speculative. Because "not every conflict in representation will be so egregious as to constitute a violation of the Sixth Amendment," "an actual, not merely hypothetical or speculative conflict must be demonstrated" for that amendment to be abridged. *United States v. Alvarez*, 580 F.2d 1251, 1255 (5th Cir. 1978). Because the conflict was speculative rather than actual, "the Court does not bear the responsibility of informing co-defendants of possible problems of joint representation." *United States v. Boudreaux*, 502 F.2d 557, 558 (5th Cir. 1974). We note that appellants have again chosen joint representation on appeal.

▮ Appellants argue that the trial judge improperly commented on the credibility of two witnesses. After appellants' counsel had asked Carter numerous questions about commingling of funds that Carter had admitted, the judge said, "I think he is clear, counsel. There's no use in pushing that further. He has made it clear." When another witness used a chart for complex figures, the judge said that the chart was not evidence, "but just . . . a summary of the explanations that the witness gave you as best he could compile those figures based upon the documents that have been introduced into evidence." Neither comment reflected in any way on the credibility of those witnesses.

▮ Appellants suggest that the government's closing argument placed before the jury damaging facts that were not in evidence, were never established in the trial, and prejudicially bore on intent. *See Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 284 (5th Cir. 1975). The prosecutrix said, "You have heard Janklow's name mentioned and other investors. The indictment

does not specify investors beyond those eight [named]. . . . It is just sufficient to show you the scheme and not so many that the case might have taken even longer than it did." Appellants failed to object, and we therefore must affirm in the absence of plain error. *See United States v. Cook*, 586 F.2d at 579; Fed.R.Evid. 103. Even if it was not wholly cumulative of trial testimony about other investors in the seven nonowned properties, the comment was at most harmless error because the "prejudicial effect, if any, of the alleged improper argument here appears to be slight, while the evidence of guilt is overwhelming." *United States v. Rodriquez*, 503 F.2d 1370, 1371 (5th Cir. 1974).

## V. JURY INSTRUCTIONS

▮ Appellants argue that the jury instructions referring to "conspiracy" were erroneous. They proposed a charge on co-conspirator declarations, and used the word "conspiracy" throughout. The district judge discussed the requested instruction at a bench conference and said, "I want to alert both counsel, you both used the word conspiracy in your requested charges. You both used that term interchangeably, this scheme as used in the statute, and if so, that's agreeable with the Court." The judge then added the phrase "or scheme" after each reference to conspiracy and gave copies of his *Apollo* instructions to both counsel. The final instructions were as follows:

> With respect to the conspiracy or scheme as alleged in the indictment you should first determine, from all of the testimony and evidence in the case, whether or not the conspiracy or scheme existed as charged. If you conclude that a conspiracy or scheme did exist as alleged, you should next determine whether the particular defendant under consideration willfully became a member of such conspiracy or scheme.

> In determining whether a defendant was a member of an alleged conspiracy or scheme, however, the jury should consider only that evidence, if any, pertaining to his own acts and statements. . . . .

On the other hand, if and when it does appear, if it should so appear, beyond a reasonable doubt from the evidence in the case that a conspiracy or scheme did exist as charged, and that the defendant under consideration was one of its members, then the statements and acts knowingly made and done, during the conspiracy or scheme and in furtherance of its objects, by any other proven member of the conspiracy or scheme, may be considered as evidence against the defendant under consideration even though he or she was not present to hear the statements made or see the acts done.

Appellants objected at the bench conference to some testimony offered to establish a prima facie case of conspiracy, and requested a "running objection to all of this matter," but the district court denied that request. They failed to object further at the conference and said that they had no objection to the jury instructions; · therefore, we will not reverse on that issue in the absence of plain error. *See* Fed.R.Crim.P. 30. Defendants need not be charged with a substantive conspiracy count to justify use of one defendant's statements made in furtherance of the "scheme or artifice to defraud" against the other defendants. Coconspirator declarations may be attributed as evidence to other conspirators, once the existence of the conspiracy has been established under *Apollo* or *James*, regardless of whether the underlying offenses being proved include conspiracy. *See United States v. Amrep Corp.*, 560 F.2d 539, 545 (2d Cir. 1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978) (mail fraud). *See also Weiss v. United States*, 120 F.2d 472, 475 (5th Cir.) *cert. denied*, 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550 (1941); *United States v. Knippenberg*, 502 F.2d 1056, 1061 (7th Cir. 1974) (mail fraud and interstate transportation of fraudulently taken property). The instruction on coconspirator declarations was not erroneous, and it clearly was not plain error because the charge is not " 'so erroneous that when considered in the totality of the charge as a whole and the evidence presented against each appellant, the error is so great as to result in the likelihood of a grave miscarriage of justice.' " *United States v. Franklin*, 586 F.2d 560, 569 (5th Cir. 1978), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1536, 59 L.Ed.2d 789 (1979) (quoting *United States v. Smith*, 502 F.2d 1250, 1256 (5th Cir. 1974)).[6]

■ Freeman, Mr. Temp, and Mrs. Temp also contend that the jury instructions on intent were erroneous. In its instructions the court stated in relevant part,

> Intent ordinarily may not be proved directly, because there is no way of fathoming or scrutinizing the operations of the human mind. However, *it is reasonable to infer that a person ordinarily intends the natural and probable consequences of his or her knowing acts.* The jury may draw the inference that a defendant intended all of the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result in any intentional act or conscious omission.

(Emphasis added.) Appellants argue that a reasonable juror would have understood the italicized language as requiring the juror to draw the inference of intent, at least unless appellants proved the contrary. They did not object, and can only obtain reversal on appeal based on the jury instruction if it contained plain error, Fed.R.Crim.P. 30, when reviewed as a whole rather than in single isolated sentences, *United States v. Roberts*, 546 F.2d 596, 598 (5th Cir.), *cert. denied*, 431 U.S. 968, 97 S.Ct. 2927, 53 L.Ed.2d 1064 (1977). The quoted instruction is nearly identical to the language suggested in *United States v. Wilkinson*, 460 F.2d 725, 733 (5th Cir. 1972) (mail fraud), and approved in *United States v. Chiantese*, 560 F.2d 1244, 1255–56 (5th Cir. 1977) (en banc) (plurality opinion), *cert. denied*, 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979). It does not contain the language shifting the burden of proof that was disap-

---

6. We do not consider whether appellants affirmatively waived any objection to the instruction by proposing a substantially similar charge.

**1124**

proved in *Mann v. United States*, 319 F.2d 404, 409 (5th Cir. 1963), *cert. denied*, 375 U.S. 986, 84 S.Ct. 520, 11 L.Ed.2d 474 (1964), and recently in *Sandstrom v. Montana*, 442 U.S. 510, 524, 99 S.Ct. 2450, 2459–60, 61 L.Ed.2d 39 (1979) (instruction that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts," *id.* at 513, 99 S.Ct. at 2453). The very next sentence in this court's charge clarifies that the jury "may" draw the inference of intent. The instruction was within the trial judge's discretion, and was neither error nor plain error.

## VI. CUMULATIVE EFFECT

Appellants assert that the cumulative effect of the errors discussed and other aspects of the trial denied them a fair trial. *See, e. g., United States v. Labarbera*, 581 F.2d 107, 110 (5th Cir. 1978). We conclude that they received a full and fair trial.

AFFIRMED.