**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 4 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee/
      Cross-Appellant,

    v.

MITCHELL BROWN,

      Defendant - Appellant/
      Cross-Appellee.

Nos. 98-2169
and 98-2205

(D. New Mexico)

(D.C. No. CR-96-514-MV)

**ORDER AND JUDGMENT** *

Before **ANDERSON** , **TACHA** , and **BALDOCK** , Circuit Judges.

    Mitchell Brown was convicted by a jury on four counts:  (1) concealing

assets from the bankruptcy court, in violation of 18 U.S.C. § 152 (Count IV); (2)

concealing assets from the FDIC, in violation of 18 U.S.C. § 1032 (Count I); (3)

inviting the FDIC to rely on his false statements, in violation of 18 U.S.C. § 1007

(Count II); and (4) conspiring to invite the FDIC to rely on his false statements, in

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel.  The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

violation of 18 U.S.C. § 371 (Count V). He challenges each of his convictions on numerous grounds. He argues that Counts I, II, and V of the indictment were defective. He also challenges the sufficiency of the evidence supporting his convictions. Finally, he contends that the jury was improperly instructed as to all four counts. On cross-appeal, the government contests the district court's finding at sentencing that no loss occurred. We reject each of these arguments for the reasons below, and affirm Brown's convictions and sentence.

## I. BACKGROUND

Mitchell Brown (Brown) and his wife, Joyce Brown, were indicted together, but Brown was tried separately. Brown's convictions center around three properties in which, according to the government's case at trial, he retained an interest which he concealed from the bankruptcy court and later the FDIC. These properties are (1) Brown's residence at 55 Ranch Road, Marin County, California (the residence); (2) the Elan Fitness Center, located in San Anselmo, California (the fitness center); and (3) the New Mexico Land Company (NMLC), a New Mexico corporation. The jury returned special verdicts as to Counts I and IV, determining that Brown concealed from both the FDIC and the bankruptcy court an interest in each of the three properties. As to Counts II and V it rendered general verdicts.

-2-

The parties presented extensive evidence at trial, only some of which is detailed here. Many of the facts relevant to this appeal are uncontested. Mitchell and Joyce Brown were married in 1980, following the execution of a valid prenuptial agreement in which they agreed to hold all property as separate property. Brown filed for bankruptcy on March 30, 1987. In 1990, the FDIC obtained a judgment against Brown for approximately $2.4 million, based on an October 1984 real estate transaction. The bankruptcy court held this debt was nondischargeable.

Brown owned the Ranch Road residence as his separate property beginning in March 1979, and the Browns have resided there continuously during their marriage. In 1986, Citicorp, which held the mortgage on the residence, foreclosed and obtained an eviction order. Brown asked Paul Kahn to purchase the house from Citicorp. Brown arranged the financing and took care of all the paperwork. Kahn signed the mortgage, and Joyce Brown paid $3000 per month to Kahn for the Browns to stay in the house. These payments were designated rent, but Kahn made no money from the arrangement because the monthly payments were only enough to cover amounts due under the mortgage. In January 1988, Kahn, who was going through a divorce, sold the house for $10 to the Anthony Brown Trust (ABT), created in favor of the Browns' minor son. Joyce Brown was

the sole trustee of the trust. As part of the transaction, the trust assumed the outstanding mortgage.

Elan Fitness Center, formerly known as Omni Fitness and Health, was purchased in 1984 by Marin Financial Corporation, an entity owned by Brown. On April 1, 1985, Brown transferred the fitness center to his wife, who since then has managed the business. The parties disagree concerning the terms and the ultimate efficacy of the transfer.

Brown Land Company (BLC), the predecessor corporation of NMLC, was organized in 1979 by Brown. Originally, Brown, his mother, and his sister owned BLC's stock in equal thirds. In September 1985, Brown transferred his stock into the Anthony Mitchell Brown Living Trust (AMBLT), with Joyce Brown as trustee. In April 1987, Robert Janes, Brown's attorney, organized the NMLC, which took over the assets of the BLC. In 1989 and 1990, Joyce Brown, both individually and as trustee for ABT, paid $45,000 to NMLC. During the same period, NMLC paid for Brown's attorney's fees. Brown's mother, paying for repair work Brown did on her house, had checks for the work made out to NMLC. The government contends that NMLC was Brown's "piggy bank," Appellee's Br. at 33; Brown insists that he was an employee of NMLC and that NMLC paid only legitimate business expenses.

Following entry of judgment against Brown in 1990 in favor of the FDIC, the FDIC attempted to identify assets that might satisfy the judgment. It deposed Brown on July 19, 1991, for that purpose. Brown testified that a trust owned the residence, that his wife owned the fitness center, and that he received only expense reimbursements from NMLC (he testified that he was also entitled to 20% of profits but that there had been none). The FDIC also obtained Brown's bankruptcy filings in the course of its investigation. The FDIC subsequently settled its $2.4 million judgment for $10,000.

## II. DISCUSSION

### A. Challenges to Indictment

Brown challenges his indictment on various grounds. First, he argues that Counts I, II, and V of the indictment were insufficient. In general, an indictment is constitutionally sufficient if it (1) alleges all the essential elements of the offense, (2) provides the defendant notice of the charge against him, and (3) is specific enough to provide double jeopardy protection. See United States v. Dashney, 117 F.3d 1197, 1205 (10th Cir. 1997). Brown argues that the first two of these requirements were not met as to Count I, because it did not specify which assets he allegedly concealed from the FDIC. He also makes the same arguments

-5-

as to Counts II and V, claiming that the government was required to specify in the indictment which allegedly false statements he made to the FDIC.

"Defenses and objections based on defects in the indictment or information (other than that it fails to show jurisdiction in the court or to charge an offense)" must be raised by motion prior to trial. Fed. R. Crim. P. 12(b)(2), 12(f); see, e.g., United States v. Freeman, 813 F.2d 303, 304 (10th Cir. 1987). Although Brown did request additional details regarding Counts I and II by moving for a bill of particulars prior to trial, he never challenged the legal sufficiency of these counts, such as by a motion to dismiss. Therefore he has waived all challenges to the sufficiency of these counts, save only the claim that they fail to charge an offense. [1]

Cognizant of this waiver rule, Brown attempts to cast his arguments in the terms of the exception. At root, however, by arguing that the indictment should have specified the false statements and assets at issue, Brown is not really claiming that Counts I and II do not charge offenses, i.e., that some essential elements of the crimes were not alleged as a matter of law. He is merely arguing that those elements should have been alleged with more factual specificity. Such claims cannot be raised for the first time at this late date. See United States v. Brown, 164 F.3d 518, 521 & n.3 (10th Cir. 1998) (evaluating challenge to

---

[1]We note that Brown's appellate counsel did not represent him at trial.

jurisdiction, but refusing to reach challenge to specificity of indictment not raised at trial); Bennett v. United States, 252 F.2d 97, 98 (10th Cir. 1958) (applying Rule 12(b)(2) to bar claim that indictment lacked sufficient detail); see also, e.g., United States v. Freeman, 619 F.2d 1112, 1118 (5th Cir. 1980) ("Appellants' contention that the indictment lacked the specificity required by the sixth amendment was waived by their failure to object before trial.") (citing United States v. Varner, 437 F.2d 1195, 1197 (5th Cir. 1971)).

Brown also challenges Count V on duplicity grounds, arguing that the district court erred in allowing the prosecution an election. Count V alleged a conspiracy (a) to make false statements to the FDIC and (b) to conceal assets from the FDIC. After a duplicity challenge by Brown prior to trial, the court forced the prosecution to choose which conspiracy to present to the jury, and the prosecution chose the false statements conspiracy. Such a forced election was entirely proper, and sufficed to cure any duplicity. See United States v. Trammell, 133 F.3d 1343, 1354-55 (10th Cir. 1998) (approving use of unanimity instruction to cure duplicity); United States v. Henry, 504 F.2d 1335, 1338 (10th Cir. 1974) ("The proper way to attack a duplicitous indictment is by a motion to elect."). We therefore reject Brown's challenges to his indictment.

**B.   Sufficiency of the Evidence**

Brown appeals the denial of his motion for a judgment of acquittal on each count of his indictment.  Thus, he challenges the sufficiency of the evidence supporting each of his convictions.     See United States v. Willis   , 102 F.3d 1078, 1083 (10th Cir. 1996).  In reviewing these claims, we "look at all the evidence, both direct and circumstantial, together with the reasonable inferences to be drawn therefrom in a light most favorable to the government to determine whether a reasonable jury could find the defendant guilty beyond a reasonable doubt." United States v. Levine   , 970 F.2d 681, 684-85 (10th Cir. 1992).

First, as to Count IV, Brown claims the government did not show that the assets Brown allegedly concealed were part of his bankruptcy estate.  The statute, 18 U.S.C. § 152(1), prohibits "knowingly and fraudulently conceal[ing] . . . any property belonging to the estate of a debtor" from the United States Trustee or other bankruptcy court officers.  Property of a debtor's bankruptcy estate is broadly defined in 11 U.S.C. § 541(a)(1) to include (with limited exceptions not applicable here) "all legal or equitable interests of the debtor in property as of the commencement of the case."  Therefore we are concerned with whether a rational juror could have found beyond a reasonable doubt that on March 30, 1987, Brown had a legal or equitable interest in any of the three properties at issue here.

Brown argues that he had no such interest in the properties as of March 30, 1987. He states that the fitness center belonged to his wife, that the residence was in Kahn's name, and that NMLC did not yet exist. However, that Brown may not have held legal title to any of these assets on the date in question is not determinative. "[E]quitable interests of the debtor," "wherever located and by whomever held," must be disclosed. 11 U.S.C. § 541(a)(1); see, e.g. United States v. Moynagh, 566 F.2d 799, 803 (1st Cir. 1977) (finding equitable interest where debtor had, prior to filing, transferred boats to corporation owned by debtor's mother and son). "[T]he issue of just what interests are 'equitable' interests in property" is "a question of fact for the jury." 1 Lawrence P. King, Collier on Bankruptcy ¶ 7.02[1][a], 7-30 & n.42 (15th ed. rev. 1999) (citing cases so holding).

There was sufficient evidence to support the conclusion that Brown held an equitable interest in at least the residence, which is enough for us to uphold his conviction on Count IV. A rational juror could reasonably infer from the testimony of Paul Kahn that Kahn was acting only as nominee title holder, and that both he and the Browns understood that the Browns were to retain de facto ownership of the residence. Kahn "didn't put up any dollars" for the purchase, and "the entire mortgage" was financed by Brown's contacts at Southern Bankers Mortgage Corporation (because the house was worth much more than the

$265,000 sale price). R. Vol. XIX at 879, 881. Kahn testified, "I felt that, you know, that I'd like to help him as long as, you know, I didn't lose any money in the proposition. . . . [A]nd frankly, . . . I didn't want to make any money on the proposition. I wanted to help a friend who was in trouble . . . ." Id. at 883. He told Brown "that I was willing to do this as long as I could do it and not be financially harmed and that I did not want to make any money on it." Id. The lease terms between Joyce Brown and Kahn were crafted to accomplish this zero-profit, zero-loss goal. There was evidence that at least some of the money paid to Kahn for rent came from Brown (and not his wife), through companies Brown controlled. See, e.g. , R. Vol. XXII at 1478 (indicating that Brown signed a check on August 10, 1987, for $3,000, made out to Paul Kahn, with the memo "house payment"). When Kahn went through a divorce in 1987, Kahn "asked Mitch [Brown] to find some other way of dealing with the property, or find another buyer or I would have to sell the property." R. Vol. XIX at 914. So the Anthony Brown Trust "was set up to purchase the 55 Ranch Road property from Paul Kahn." Appellant's Br. at 7 n.2. Kahn testified, "again, under my premise, which was I didn't want to make any money and I didn't want to get harmed, I sold it back to them for—I sold it back to the trust for $10 subject to the liens, meaning they had to assume the mortgage obligations and anything else on the property." R. Vol. XIX at 913. This sale was consummated only months after Brown

declared bankruptcy. Kahn, who had spent time as a real estate developer, believed at the time that the house was actually worth in excess of $400,000. Id. at 915. When, after the sale, Kahn determined that he owed approximately $5000 in taxes on the sale, he asked the Browns to pay that amount, which they did. Id. at 924-26.

This circumstantial evidence supports the inference that Brown retained an interest which he was required to disclose to the bankruptcy court. Cf. United States v. Edwards, 905 F. Supp. 45, 48-49 (D. Mass. 1995) ("The Government was . . . entitled to . . . prove by circumstantial evidence that the conveyance was a sham transaction, that Edwards retained an equitable interest in the condominium, and that Edwards committed a crime by failing to disclose it in his bankruptcy proceeding.")

The possibility that Brown's interest was worthless or exempt, and was therefore of no value to creditors, is not crucial. "Debtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or are unavailable to the bankruptcy estate." In re Yonikus, 974 F.2d 901, 904 (7th Cir. 1992). This is because "[a]llowing debtors the discretion to not report exempt or worthless property usurps the role of the trustee, creditors, and the court by denying them the opportunity to review the factual and legal

-11-

basis of debtors' claims."   Bensenville Community Ctr. Union v. Bailey (In re Bailey ), 147 B.R. 157, 163 (Bankr. N.D. Ill. 1992).

Brown protests that his dealings with Kahn and the creation of the Anthony Brown Trust were of themselves perfectly legal.  That may or may not be, but it does not absolve Brown of his duty to disclose the nature of these dealings to the Bankruptcy Court.

Brown raises similar challenges to the evidence supporting Counts I, II, and V.  In essence, he argues that the government never showed that he had a legal interest in the three properties, and that therefore he could not have (1) concealed, (2) lied about, or (3) conspired to lie about such an interest.  We reject these arguments for similar reasons.  It was sufficient for the government to show that Brown concealed from the FDIC, lied to the FDIC about, and conspired to lie to the FDIC about his   equitable  interest in the residence.

Finally, Brown argues that the factual allegations in Counts I, II, and V were so vague as to "make[] it impossible to assess whether those facts have been proven by sufficient evidence."  Appellant's Br. at 38.  This is essentially a recasting of his challenge to the specificity of the indictment, which he has waived.

## C. Jury Instructions

Brown raises several challenges to the jury instructions given by the district court. As to Count V, Brown argues that the jury should have been required to find that the false statements alleged were material. He contends that the court erred when it instructed the jury that Brown's bankruptcy declaration was material as a matter of law. Brown did not raise this issue before the district court. We agree with Brown that the court erred, on the authority of United States v. Gaudin, 515 U.S. 506 (1995) (holding that materiality element of false statements offense must be decided by jury). [2] However, even assuming that this error was not harmless (which is by no means clear, see Neder v. United States, 119 S. Ct. 1827, 1999 WL 373186 (1999) (finding Gaudin error harmless)), we may correct such an error not raised at trial only if "the forfeited error seriously affects the fairness, integrity or public reputation of judicial proceedings." Johnson v. United States, 520 U.S. 461, 469 (1997) (internal quotes omitted); see also United States v. Schleibaum, 130 F.3d 947, 949 (10th Cir. 1997) (en banc) (applying Johnson); United States v. Clifton, 127 F.3d 969, 971-72 (10th Cir. 1997) (same). Not only does Brown not point to any particularized unfairness resulting from the Gaudin error, but, more to the point, he does not argue on appeal that the

---

[2]The government seeks to distinguish Gaudin because it involved a substantive false statements offense, not a conspiracy charge. The government's unsupported arguments on this point are not persuasive.

declaration in question was not material. See Johnson, 520 U.S. at 470 ("Materiality was essentially uncontroverted at trial and has remained so on appeal."); cf. Neder, 1999 WL 373186, at *11 ("Neder did not argue to the jury—and does not argue here—that his false statements of income could be found immaterial."). Thus, he has not made an adequate claim for relief. Brown also contends that the district court erred in not instructing the jury that it was required to agree unanimously on each element of each charged offense. Brown did not ask for such an instruction at trial, and he now claims the court's failure to give such an instruction sua sponte was plain error. The court did give the following instruction: "To reach a verdict, whether it is guilty or not guilty, all of you must agree. Your verdict must be unanimous on each count of the indictment." R. Vol. XXVII at 2285. Such general unanimity instructions are presumptively sufficient in this circuit. See, e.g., United States v. Linn, 31 F.3d 987, 991 (10th Cir. 1994). Brown has not shown that this case falls outside the presumptive rule.

As to Counts II and V, Brown argues that the jury should have been instructed that in order to convict, it had to agree unanimously on a particular false statement. Brown did not request such an instruction at trial. Yet in each of the appellate cases cited by Brown requiring such an instruction, the defendant had first requested and been denied such an instruction by the trial court. See

United States v. Holley, 942 F.2d 916, 922 (5th Cir. 1991); United States v. Duncan, 850 F.2d 1104, 1105 (6th Cir. 1988); United States v. Ferris, 719 F.2d 1405, 1406 (9th Cir. 1983). We have held that a district court's failure to give such a factually specific unanimity instruction sua sponte is not plain error. See United States v. Smith, 13 F.3d 1421, 1427 (10th Cir. 1994). We therefore reject Brown's arguments on this point.

Brown also argues that the jury was inadequately instructed on the legal principles necessary to render fair verdicts in this case. Again, he acknowledges not requesting at trial the instructions he now favors. We therefore review only for plain error. See United States v. Duran, 133 F.3d 1324, 1330 (10th Cir. 1998). For Brown to prevail, he must show that the court gave obviously erroneous instructions that, considered as a whole, misled the jury and affected his substantial rights. See id.

Brown claims that the district court should have instructed the jury sua sponte on various principles of California law, including the effect of prenuptial agreements, the writing requirement of the Statute of Frauds, and the elements of fraudulent transfers. He argues that if the jury had received such instructions, it would have concluded that he had no interest in any of the assets at issue. We think an instruction on the Statute of Frauds' writing requirement was not appropriate, much less required to be given sua sponte. The absence of a written

agreement between Brown and Kahn did not preclude a finding of guilt, as we have explained above regarding equitable interests. And although it appears that instructions on fraudulent transfers and prenuptial agreements may have been relevant and helpful in some degree, we do not think the lack of such instructions misled the jury, viewing the instructions as a whole.

Brown argues that the district court's definition of "estate of a debtor" was confusing and prejudicial as to Count IV. He cites the court's statement that a bankruptcy estate "may also be used to mean property acquired after the commencement of the proceeding," R. Vol. XXVII at 2201, and argues that the jury was never instructed that after-acquired property is included only if it is the proceeds of estate property. As the government correctly notes, however, the issue of after-acquired property was relevant to only one of the three properties listed in Count IV (NMLC), and the jury rendered special verdicts on each of the three properties. Thus, even assuming that the jury misunderstood or misapplied the law regarding after-acquired properties, its error affected only one of three independently sufficient grounds for a conviction on Count IV.

For these reasons, the district court committed no reversible error by not giving jury instructions that Brown did not request at trial.

**D. Cross-Appeal: Loss Level at Sentencing**

The government contests the district court's determination that Brown's sentence should not be enhanced under USSG § 2F1.1, which increases a fraud defendant's offense level for offenses involving either an actual or intended loss in excess of $2,000. See USSG § 2F1.1(b) & comment. (n.7). We review the district court's legal interpretation of § 2F1.1 de novo, and review its findings of fact on the issue of loss for clear error, giving due deference to its application of the guidelines to the facts. See United States v. Janusz, 135 F.3d 1319, 1324 (10th Cir. 1998).

The government has the burden of proving loss by the preponderance of the evidence. See United States v. Reddeck, 22 F.3d 1504, 1512 (10th Cir. 1994). The district court determined that the government had not met its burden. The government's primary argument was that loss should be measured by the entire amount of the judgment the FDIC settled ($2.4 million), which would result in a 12-point increase in offense level. The court disagreed and instead analyzed loss in terms of the value of the three concealed assets, both at the time of Brown's bankruptcy filing and at the time of his settlement agreement with the FDIC. On this analysis, it found that the government had failed to prove any loss because (a) there was no showing that the Anthony Brown Trust was invalid, or that the residence was transferred fraudulently, and in any event, at the time of the

bankruptcy there was no equity in the residence; (b) Brown retained no ownership interest in the fitness center; and (c) NMLC did not exist at the time the bankruptcy was filed, and there was "a failure of proof in terms of the value of New Mexico Land Company that can be attributed to Mr. Brown" at the time of the settlement agreement. R. Vol. XIV at 147.

On appeal, the government again focuses almost its entire argument on the claim that loss should be measured by the $2.4 million judgment, reasoning that Brown intended such a loss by fraudulently inducing the FDIC to settle its judgment. We note that the $2.4 million judgment against Brown apparently resulted from conduct unrelated to the offense here (the government does not argue otherwise). That is, although at some point Brown did something that ended in his owing the FDIC $2.4 million, that is not this case. The question here is what loss Brown intended to cause the FDIC by concealing and lying about three specific assets that might satisfy the judgment to some extent.

We emphasize that the government does not argue that actual loss amounts to $2.4 million; it bases its entire argument here on intended loss. Yet as a matter of law in this circuit, intended loss "cannot exceed the loss a defendant in fact could have occasioned if his or her fraud had been entirely successful." United States v. Santiago, 977 F.2d 517, 524 (10th Cir. 1992). Thus, "the fair market

value of what a defendant has taken or attempted to take defines the upper limit for loss valuation under Guidelines § 2F1.1." Id. at 525.

The government essentially takes the position that the property "taken" by Brown was the $2.4 million judgment, not just the properties he concealed. This attempted distinction misses the point. In circumstances like these, a judgment's fair market value is bounded by the worth of the assets sought in satisfaction of the judgment. The most the government can claim is that Brown intended to prevent it from realizing the value of the concealed assets. Therefore the only relevant measure of intended loss is the value of those assets.

The government argues alternatively that Brown gained $2.4 million by inducing the FDIC to settle its judgment. First of all, for the reasons above, it does not necessarily follow that Brown actually gained that amount. But more to the point, a defendant's gain may be used only as an "alternative estimate" of actual or intended loss. USSG § 2F1.1 comment. (n.8). The issue posed by the government's arguments on the question of loss is not difficulty of measurement, but what to measure. For the reasons above, we think the district court was correct to look only at the value of the three assets concealed.

Having expended its energy arguing for a loss of $2.4 million, the government makes little effort to argue for any other measure of loss. The government's only other argument on appeal is that the district court's findings

are clearly erroneous because they impermissibly conflict with the jury's guilty verdicts.  This claim is made in the most summary fashion, with only a cursory discussion of the alleged conflict, and without any citation to authority.

The government concedes that "loss is not a required element" of any of the crimes for which Brown was convicted, Appellee's Br. at 57, and therefore the jury was never asked to determine the issue.    For example, as to Count IV, the government argued to the jury as follows:

> [Brown] wanted to keep the house, an admirable goal, so long as it is not done to conceal assets or to hide and to lie to the people to whom you are required to tell the truth.
>
> I might also point out at this point, because it is kind of an issue, nobody knows today what would have happened if Mr. Brown had put every single thing in that bankruptcy petition, if he had written down, Paul Kahn is holding this house. . . .
>
> It's very possible that the bankruptcy court would have said, well, you know, he's got a family,  he needs to stay in that house, we're not going to force a sale of that house.  But that's not the point.  The point is, Mr. Brown had an absolute obligation to tell the bankruptcy court and let the bankruptcy court make that decision.

R. Vol. XXVII at 2229.  In principle then, there is no inconsistency between the jury's verdicts and a finding of no loss; any inconsistency would have to be in the specifics.  The government thus argues that "it is difficult to see      under the facts of this case  how there could be no loss to the FDIC."  Appellee's Br. at 57 (emphasis added).  The government does not tell us what these key facts are.  It states only that the court's finding that "it was not persuaded that the transactions

-20-

were fraudulent . . . encroached on the jury's findings of fact."    Id. at 58.  This is a considerable oversimplification of the issue.  For example, following the tenor of the government's closing argument above, the jury may well have thought that the only crime Brown committed with relation to the house was not telling the bankruptcy court about a perfectly legal transfer.

Some of the conflicts between the jury's verdicts and the court's sentencing findings are obvious and troubling.  The court appears to have found that Brown in fact had no interest in the fitness center.    See R. Vol. XIV at 145, 146.  The court also determined essentially that Brown had no interest in the residence at the time of the FDIC settlement.    See id. at 151.  But it is easy to understand how the court arrived at these conclusions given the dearth of proof offered by the government at sentencing regarding precisely what property interests could be attributed to Brown.  Although the government provided evidence regarding the total value of each of the assets, it never attempted to show what portion of that value was properly attributable to Brown.  This problem is most apparent with regard to the fitness center.  The court acknowledged that "the jury verdict does stand for the proposition that there was a finding by the jury implicitly that the defendant had some interest in the fitness center."    Id. at 145.  Yet it had no way to evaluate that interest, because despite strong evidence that Joyce Brown had at least some property interest in the fitness center (it had increased in value in part

due to her personal efforts), the government never attempted to provide even an estimate of the portion of the property which could properly be attributed to Brown himself. It likewise makes no such arguments on appeal, with regard to this or either of the other assets. The government has set high hurdles for itself with its "all-or-nothing" stance at sentencing and on appeal.

On the record before us, we conclude the court's findings do not necessarily undermine the convictions. Its reasoning is repeatedly stated in terms of a "failure of proof." Given the narrow theories of liability argued at trial and the complicated nature of the property interests involved, the government was not entitled at sentencing merely to rest on the jury's verdicts coupled with evidence regarding overall asset values. The court was empowered and indeed required to make its own findings on the facts relating to loss, and after a full hearing, it held that the government had not met its burden. See Fed. R. Crim. P. 32(c)(1); United States v. Garcia, 78 F.3d 1457, 1463 n.6 (10th Cir. 1996) ("The judge remains ultimately responsible for determining the facts [at sentencing] . . . ."); cf. United States v. Tavano, 12 F.3d 301 (1st Cir. 1993) (finding error in sentencing court's refusal to consider evidence favorable to defendant and inconsistent with evidence presented at trial). Although we have misgivings about some aspects of the district court's findings, on this record, we have no basis for disturbing its decision.

AFFIRMED.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge