# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 02-3059 & 02-3060

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JOHN FASSNACHT
and VINCENT MALANGA,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 CR 63—**Blanche M. Manning**, *Judge.*

———————

ARGUED FEBRUARY 27, 2003—DECIDED JUNE 6, 2003

———————

Before KANNE, DIANE P. WOOD, and EVANS, *Circuit Judges.*

KANNE, *Circuit Judge.* John Fassnacht and Vincent Malanga appeal their convictions for obstructing justice in violation of 18 U.S.C. § 1503. They argue that the obstruction offense was neither properly charged in the indictment nor sufficiently proven at trial—basically, that the obstruction charge was included by the government as an afterthought, tacked on to the primary charges of tax evasion and conspiring to impede the Internal Revenue Service. We, however, find that the indictment provided sufficient notice of the conduct for which Fassnacht and Malanga were being

charged and that the government presented sufficient evidence at trial for a rational jury to have found the defendants guilty of obstruction of justice. We affirm the convictions.

## HISTORY

Donald Newell and Vincent Malanga were partners and each fifty-percent shareholders in the Chicago-based investment firm of LaSalle Portfolio Management, Inc. ("LPM, Inc."). LPM, Inc. advised clients on investment decisions and invested client funds in return for management and incentive fees. Newell, as President of LPM, Inc., worked from its Chicago office, handling all administrative aspects of the firm. Malanga served as Vice President, and was the sole LPM, Inc. representative in the New York office, responsible for trading on behalf of its clients.

In the early 1990s, Malanga and Newell began to discuss the possibility of setting up an investment fund in Bermuda, which would allow foreign investor clients to avoid United States tax obligations on income generated from their investments. They enlisted the services of John Fassnacht, a certified public accountant knowledgeable in international financial transactions, to help set up the Bermuda entity. In February 1993, with the help of Fassnacht and a Bermuda law firm, LaSalle Portfolio Management, Limited ("LPM, Ltd.") was formally incorporated in Bermuda. By January 1994, Newell and Malanga were each twenty-five-percent shareholders in LPM, Ltd., while Edmond Burke, a Swiss investment advisor recommended by Fassnacht (but whom neither Newell or Malanga had ever met or spoken with), held fifty-percent of the Bermuda entity.

In early 1994, LPM, Inc. was due to receive an incentive fee of $1.35 million from one of its foreign clients, the Abu

Dhabi Investment Authority ("ADIA") for services performed by LPM, Inc. in 1993 (ADIA had been a client of LPM, Inc. since 1990). Rather than receive the incentive fee directly, Newell and Malanga directed ADIA to deposit the fee in an LPM, Ltd. bank account in Bermuda. LPM, Inc.'s 1994 tax returns failed to include the $1.35 million fee as income. In turn, the individual 1994 tax returns for Newell and Malanga failed to include as income their portions of the $1.35 million fee.[1]

Most of the $1.35 million fee sat in the Bermuda bank account for some 18 months. In February 1996, Malanga was planning to purchase a new home and needed a portion of the incentive fee to put toward a down payment. At a February 13th meeting in New York, Malanga discussed his need for the money with Fassnacht and Newell. The three agreed to forward $400,000 to Malanga, and on February 15th, that money was transferred to Malanga's real estate attorney.

Also in early 1996, Newell discovered that LPM, Inc. employee Angela Dancisak had been embezzling funds from both LPM, Inc. and LPM, Ltd. Shortly thereafter, Dancisak was fired under less than amicable conditions. Dancisak then contacted the IRS to provide information about LPM's Bermuda operations and the $1.35 million incentive fee diverted to LPM, Ltd.

Apparently aware that Dancisak—a disgruntled former employee with intimate knowledge of LPM, Inc.'s financial affairs—posed a risk of disclosing damaging information to government authorities, Newell, Malanga, and Fassnacht began discussing how to defend their tax treatment of the

---

[1]  As a Subchapter S corporation, LPM, Inc.'s income was reported but not taxed at the corporate level. Income to the corporation was distributed annually to the shareholders (in this case, Newell and Malanga), who were responsible for paying tax on that income.

$1.35 million incentive fee. Newell testified that in a January 15, 1996 telephone call in which all three individuals participated, Fassnacht inquired whether "it would have been feasible to have paid someone a finder's fee for introducing LaSalle to the people at ADIA." Newell testified that he agreed to prepare a scenario "describing what would have had to have happened for this to have actually happened." They discussed using Edmond Burke as the "finder" who would have introduced LPM, Inc. to ADIA. According to this scenario, the LPM principals would testify that they reached an agreement with Burke in 1989 for him to assist in opening and managing the ADIA account in return for a one percent fee up to $1 million, plus a twenty-five-percent bonus if certain benchmarks were met. Newell clarified, however, that such a sequence of events "did not actually happen," and that there was no factual basis for any part of the scenario he had prepared.

Based on the information provided by Dancisak, the IRS opened a federal grand jury investigation (number 96 GJ 258) into whether LPM, Inc. and LPM, Ltd. had acted to avoid paying taxes due on the $1.35 million ADIA incentive fee. IRS Criminal Investigation Division Special Agent Kristine Tice served as the case agent (or lead agent) for the grand jury investigation. As part of this investigation, on March 26, 1996, IRS agents executed a search warrant at LPM, Inc.'s Chicago offices. Also on that day, the IRS sought to interview partners Newell and Malanga. Newell initially refused to talk to the agents, but Malanga was interviewed in New York by two IRS agents who identified themselves as special agents with the IRS Criminal Investigation Division. According to Special Agent Lawrence Egan, Malanga told the agents during that interview that Burke was a marketing representative for LPM, and in that capacity had introduced ADIA to LPM. He also told the agents that the $1.35 million incentive fee from ADIA was directed to the Bermuda account to pay Burke

for his services and to help set up an offshore account for foreign investors. Malanga stated that he had received no part of the $1.35 million incentive fee.

On April 1, 1996, a grand jury subpoena was served on Fassnacht by Special Agent Egan; the subpoena requested that Fassnacht provide any and all records relating to LPM, Inc.; LPM, Ltd.; Donald Newell; and any entity owned or controlled by Newell. Fassnacht provided one document in response to the subpoena. Also on the day the subpoena was served, Fassnacht was interviewed via telephone by Special Agent Tice, who testified at trial that she also introduced herself as a Special Agent with the IRS Criminal Investigation Division. She testified that during her interview of Fassnacht, he told her that Burke had introduced ADIA to Newell, for which he was due a finder's fee of approximately $1 million, and that the $1.35 million incentive fee was directed to LPM, Ltd.'s account in Bermuda to be used to pay Burke's finder's fee.

After his initial refusal to cooperate with the IRS agents, and upon advice of counsel he retained after the search of LPM, Inc.'s offices, Newell began recording his telephone conversations with Malanga and Fassnacht without their knowledge. He later agreed to cooperate with the government and continued recording conversations using government-provided equipment. Newell's testimony and the recorded conversations were major elements of the government's case at the subsequent trial of Fassnacht and Malanga. Newell himself was tried and convicted on two counts of filing a false tax return (on behalf of himself and LPM, Inc.) and was sentenced to 30 months imprisonment. He testified at the trial of Fassnacht and Malanga under a grant of immunity from further prosecution.

Fassnacht and Malanga were ultimately charged by the grand jury in a five-count indictment. Count One alleged that the two defendants had conspired to commit tax eva-

sion, Counts Two and Three alleged attempts to evade income tax due in connection with Newell's and Malanga's 1994 federal income tax returns, and Count Four alleged obstruction of justice with respect to the grand jury investigation into the alleged tax evasion. Fassnacht was separately charged in Count Five with making false statements to an IRS agent. At the close of the government's case-in-chief, the district court granted the defendants' joint motion for a directed verdict on Counts Two and Three. The jury found Fassnacht and Malanga guilty on the charge of obstructing justice (Count Four), not guilty on the charge of conspiring to defraud the IRS (Count One) and, with respect to Fassnacht only, not guilty on the charge of making a false statement to an IRS investigator (Count Five).

Pursuant to Federal Rule of Criminal Procedure 29, Fassnacht and Malanga moved for a judgment of acquittal on the obstruction of justice charge, the only count on which they were convicted, arguing that (1) Count Four of the indictment was vague and confusing, and the government had failed to cure this problem by providing further particulars, and (2) the evidence presented at trial was insufficient to support a guilty verdict on the obstruction charge. The district court denied the defendants' motion, and sentenced each defendant to serve one year and one day in federal custody.

Fassnacht and Malanga now appeal their convictions, arguing first that the obstruction of justice count of the indictment was constitutionally deficient (and that the district court erred in failing to correct that deficiency by granting their motion for a bill of particulars). Further, they argue that the evidence offered at trial was insufficient to support their convictions for endeavoring to obstruct the grand jury investigation. For the reasons set forth below, we reject both arguments and affirm the convictions.

## ANALYSIS

Fassnacht and Malanga were convicted under the "Omnibus Clause" of 18 U.S.C. § 1503, the federal obstruction of justice statute. This clause, known as the statute's "catch-all" provision for its broad language, provides in relevant part that "[w]hoever corruptly . . . endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b)." 18 U.S.C. § 1503(a) (2003).

### A. *The Sufficiency of the Indictment*

The first argument raised by Fassnacht and Malanga is that the indictment under which they were charged was constitutionally defective in failing to provide adequate notice of the offense conduct for which they were being tried. They contend that Count Four of the indictment, charging them with violating the federal obstruction of justice statute, failed to identify specific acts that were directed at obstructing the grand jury investigation. We review the sufficiency of an indictment *de novo*. *United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000).

The Fifth Amendment guarantee of the right to indictment by a grand jury, its protection against double jeopardy, and the Sixth Amendment guarantee that a defendant be informed of the nature of the charges against him establish the minimum requirements for an indictment. *See United States v. Hinkle*, 637 F.2d 1154, 1157 (7th Cir. 1981). For an indictment to be legally sufficient, it must accomplish three functions: it must state each of the elements of the crime charged; it must provide adequate notice of the nature of the charges so that the accused may prepare a defense; and it must allow the defendant to raise the judgment as a bar to future prosecutions for the same offense. *See Smith*, 230 F.3d at 305; *see also Russell v. United*

*States*, 369 U.S. 749, 763-64 (1962). We have cautioned that the sufficiency of an indictment is to be reviewed practically, with a view to the indictment in its entirety, rather than in any "hypertechnical manner." *Smith*, 230 F.3d at 305 (quotation omitted).

The indictment here meets the first test of sufficiency by including each of the elements of the obstruction charge. Count Four asserted in part that the defendants had "corruptly endeavor[ed] to influence, obstruct, and impede the due administration of justice"—language which parallels that of the Omnibus Clause of § 1503. *See id.* ("[I]t is generally acceptable for the indictment to 'track' the words of the statute itself, so long as those words expressly set forth all the elements necessary to constitute the offense intended to be punished." (citing *Hinkle*, 637 F.2d at 1157)).

Fassnacht and Malanga note, however, that "an indictment that tracks the statutory language can nonetheless be considered deficient if it does not provide enough factual particulars to 'sufficiently apprise the defendant of what he must be prepared to meet.'" *Id.* (quoting *Russell*, 369 U.S. at 763); *see also Hinkle*, 637 F.2d at 1158 (holding an indictment legally insufficient when it failed to inform the defendant of "the gravamen of the alleged offense"). Fassnacht and Malanga argue that, in their case, the government failed to include within the indictment references to any specific acts aimed at obstructing the grand jury investigation into their tax affairs. This, they contend, compromised their preparation of a defense to the obstruction charge.

While it is true that an indictment must do more than recite the statutory elements, this does not mean that the government is required to provide "every factual nugget necessary for conviction." *Smith*, 230 F.3d at 306. Rather, the indictment need only "provide some means of pinning down the specific conduct at issue." *Id.* at 305 (citation omitted). We again caution against reviewing the suffi-

ciency of an indictment in a "hypertechnical manner," *id.* at 305 (quotation omitted); in determining whether an indictment provides sufficient information to enable the preparation of a defense, "the presence or absence of any particular fact need not be dispositive of the issue." *Id.*

Count Four of the indictment did, in fact, provide a number of factual details to which Fassnacht and Malanga could have looked to determine the conduct on which the government intended to rely. That count first realleged and incorporated the twenty-six factual paragraphs contained in Count One; those paragraphs detailed the defendants' actions in allegedly conspiring to hide income in an offshore company and then to cover up that effort to evade paying taxes on that income. Particularly relevant to the obstruction charge in Count Four, Paragraph 9 notes that on or about March 26, 1996, a federal grand jury began an investigation into the alleged tax evasion scheme. Paragraphs 11 through 13 assert that the defendants concocted fictitious explanations, supported by false documents, in an attempt to cover up their alleged tax evasion. Paragraphs 14 and 15 point to interviews of Malanga and Fassnacht, conducted by IRS *Criminal* Investigation Division special agents, in which both made false statements regarding their activities (both interviews occurred on or after the date the grand jury investigation began). Paragraphs 16 through 25 detail further efforts by both defendants to stick with, refine, and support (with false documents) their initial ficitious explanation—again, all after the grand jury began its investigation.

Fassnacht and Malanga correctly point out that nowhere in the indictment does it refer to an act or endeavor specifically aimed at the grand jury investigation. In their brief, they also correctly note that a conviction under § 1503 requires the specific intent to influence a judicial proceeding—an intent to impede an IRS investigation alone, or

mere knowledge of an ongoing grand jury proceeding without an intent to influence its investigation, is insufficient to support a conviction under the obstruction-of-justice statute. They contend that the government's failure to allege any acts specifically aimed at obstructing the grand jury render the indictment defective.

Fassnacht and Malanga ask too much from the indictment. After all, "[t]he defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved." *United States v. Kendall*, 665 F.2d 126, 135 (7th Cir. 1981) (citing *United States v. Freeman*, 619 F.2d 1112, 1118 (5th Cir. 1980)). Once the elements of the crime have been specified, an indictment need only provide enough factual information to enable the defendants to identify the conduct on which the government intends to base its case.

In noting the existence of the grand jury investigation as well as the defendants' continuing reliance on their fictitious explanation for their treatment of the incentive fee in an attempt to cover up their perceived wrongdoing, the factual averments incorporated from Count One provided sufficient guidance for Fassnacht and Malanga to determine the conduct for which they were being charged. Count Four itself additionally specified the time period in which the defendants allegedly acted ("[f]rom approximately March 26, 1996 and continuing thereafter until in or about May 1996") and the object of their actions (identifying "Federal Grand Jury investigation 96 GJ 258 in the Northern District of Illinois"). Given this information, we believe that Count Four of the indictment "sufficiently narrowed the category of behavior" which Fassnacht and Malanga would be called to defend, *Smith*, 230 F.3d at 306, and was therefore constitutionally sound.

### B.  *The Motion for a Bill of Particulars*

Given the general sufficiency of the indictment, we believe that the district court did not abuse its discretion in denying Fassnacht's and Malanga's motion for a bill of particulars. The choice to grant or deny such a motion is committed to the discretion of the trial court, and a decision denying a bill of particulars will be reversed only if it can be shown that the trial court abused its discretion in doing so. *Kendall*, 665 F.2d at 134.

The test for determining whether a bill of particulars should have been granted is similar to the test for determining the general sufficiency of the indictment, as discussed above: that is, "whether the indictment sets forth the elements of the offense charged and sufficiently apprises the defendant of the charges to enable him to prepare for trial." *Id.* (quotation omitted). An indictment which includes each of the elements of the offense charged, the time and place of the accused's conduct which constituted a violation, and a citation to the statute or statutes violated is sufficient to pass this test. *See id.*; *United States v. Roya*, 574 F.2d 386, 391 (7th Cir. 1978).

In this case, Fassnacht and Malanga moved for a bill of particulars, pursuant to Federal Rule of Criminal Procedure 7(f), contending that they were entitled to know what specific acts the government believed they undertook in violation of § 1503. In denying the motion, the district court found that "[t]aken as a whole, the indictment is sufficiently specific and informative to apprise each of the defendants of the nature of the charges and to enable them to prepare a defense."

Given our disposition of the defendants' challenge to the sufficiency of the indictment, we do not believe the district court abused its discretion in reaching its assessment. Count Four of the indictment indicated the statute under

which the defendants were being charged, set forth each of the elements constituting a violation of that statute, and provided sufficient details regarding the defendants' conduct for which they were being charged.[2] Given this information, the district court was within its discretion in denying the defendants' motion for the bill of particulars.

## C. *Sufficiency of the Evidence*

Fassnacht and Malanga next contend that the district court should have granted their motion for a judgment of acquittal because, they argue, the evidence presented at trial was insufficient to sustain their convictions for obstruction of justice. We review the denial of a motion for a judgment of acquittal *de novo. United States v. Hach*, 162 F.3d 937, 942 (7th Cir. 1998). In reviewing the district court's decision, we take the evidentiary basis for the jury's verdict "in the light most favorable to the government . . . and will uphold the conviction if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Granados*, 142 F.3d 1016, 1019 (7th Cir. 1998) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We will overturn the jury's verdict "only if the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Id.* (citations omitted). "Proving that no

---

[2] We further note that "a bill of particulars is not required when information necessary for a defendant's defense can be obtained through 'some other satisfactory form.'" *United States v. Canino*, 949 F.2d 928, 949 (7th Cir. 1991) (quoting WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CRIM 2D. § 129, at 436-48 (1982)). The government in this case provided the defendants with extensive pretrial discovery, giving them full access to all documentary evidence in the government's possession, thus further obviating the need for a bill of particulars. *See id.*

such evidence exists presents a nearly insurmountable hurdle to the defendant.*" Hach*, 162 F.3d at 942 (quotation omitted).

To prove an obstruction of justice charge under § 1503, the government must show, beyond a reasonable doubt, that there was a pending judicial proceeding, that the defendant was aware of that proceeding, and that the defendant corruptly intended to impede the administration of that judicial proceeding. *United States v. Maloney*, 71 F.3d 645, 656 (7th Cir. 1995). Fassnacht and Malanga claim that the evidence presented at trial, aimed primarily at proving a scheme of tax evasion, was insufficient to support a guilty verdict on the obstruction of justice charge. Our examination of the record, however, convinces us that there was sufficient evidence to sustain the jury's verdict.

The dispute in this case essentially comes down to the question of the intended object of Fassnacht's and Malanga's obstructive efforts. The defendants argue that the government offered evidence which showed that, while they were aware of the grand jury proceeding, they only acted with an intent to mislead the *IRS investigation*. The government contends that there was sufficient evidence from which the jury could have concluded that the *grand jury investigation* was an object of the defendants' efforts. We agree with the government.

This Court has previously held that conviction under § 1503's "corruptly endeavors" language requires, as an element of the offense, the specific intent to impede, obstruct, or interfere with a judicial proceeding. *See United States v. Bucey*, 876 F.2d 1297, 1314 (7th Cir. 1989); *see also United States v. Schwarz*, 283 F.3d 76, 107 (2d Cir. 2002). In *United States v. Aguilar*, the Supreme Court explained that to prove specific intent, the government must demonstrate some kind of "nexus" between the action taken by the accused and the judicial proceeding: "the act must have a

relationship in time, causation, or logic with the judicial proceedings . . . . In other words, the endeavor must have the 'natural and probable effect' of interfering with the due administration of justice." 515 U.S. 593, 599 (1995) (citations omitted).

On the other hand, "if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct." *Id.* The Second Circuit phrased the intent element this way: "the conduct offered to evince that intent must be conduct that is directed at the court or grand jury and that, in the defendant's mind, has the 'natural and probable effect' of obstructing or interfering with that entity." *Schwarz*, 283 F.3d at 109 (citing *Aguilar*, 515 U.S. at 599). Mere knowledge of a judicial proceeding is not enough to support a conviction under § 1503. *See id.* at 107 ("[K]nowledge of an existing grand jury investigation or the foreseeability of such an investigation, by itself, is not enough to sustain a conviction under § 1503.").

A grand jury investigation constitutes the "due administration of justice" for purposes of § 1503, but an IRS investigation, standing alone, does not. *See Aguilar*, 515 U.S. at 599; *United States v. Ryan*, 455 F.2d 728, 733 (9th Cir. 1972) ("[A]n investigation by the Internal Revenue Service or by any other governmental agency would not constitute a judicial proceeding."). The Supreme Court emphasized this distinction in *Aguilar*: "[t]he action taken by the accused must be with an intent to influence judicial or grand jury proceedings; it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority." 515 U.S. at 599.

Given this distinction, the Supreme Court warned that it did not believe that "uttering false statements to an investigating agent . . . who might or might not testify before a

grand jury is sufficient to make out a violation of the catch-all provision of § 1503." *Id.* at 600. Under *Aguilar*, there-fore, there is a significant difference between an accused who provides a false statement to an investigator with the knowledge that the evidence will be provided to the grand jury (or an accused who provides false evidence directly to the grand jury), and an accused who simply makes false statements to an investigative agent. *See id.* at 601. If an accused makes a false statement to an investigating agent without the knowledge that the agent will forward that information to the grand jury, it is "far more speculative" whether the false statement will have the "natural and probable effect" of obstructing justice. *Id.* Such speculation is insufficient to support a conviction under § 1503.

Further complicating the distinction between judicial proceedings and investigative efforts, we have held that an investigation by a government agency undertaken in direct support of a grand jury investigation constitutes the "due administration of justice." For example, in *United States v. Furkin*, the defendant failed to report income from certain gambling machines on his federal tax returns and was con-victed of conspiracy to defraud the IRS; he was also con-victed of obstruction of justice under § 1503 for his efforts to impede the criminal investigation into his tax evasion. 119 F.3d 1276, 1278-79 (7th Cir. 1997). In challenging his conviction under § 1503, Furkin argued that the evidence against him indicated, at most, an intent to impede the IRS investigation, but not the grand jury investigation. *Id.* at 1282. We disagreed, noting that the evidence demonstrated that "Furkin was also aware that the IRS was *integrally in-volved* in the grand jury investigation . . . . The IRS investi-gation was not some 'ancillary proceeding' unrelated to the grand jury investigation. Indeed, the IRS investigation and the grand jury investigation were *one and the same*, and the evidence established that Furkin understood this fact." *Id.* at 1282-83 (emphasis added); *see also Aguilar*, 515 U.S. at

600 (noting that obstruction of an investigation by FBI agents may constitute a violation of § 1503 if "the agents acted as the arm of the grand jury").

Like the situation in *Furkin*, there was sufficient evidence presented in this case for the jury to have rationally concluded that Fassnacht and Malanga were aware of the grand jury investigation into their tax returns and that they understood that the IRS agents were "integrally involved" in that grand jury investigation or, at the least, that the IRS agents would provide to the grand jury the information they garnered from the defendants.

The government presented evidence that in January 1996, Fassnacht, Malanga, and Newell began to concoct a cover story to obscure any wrongdoing with regard to their handling of the $1.35 million incentive fee, after realizing that terminating Dancisak presented the risk that she might go to the authorities with information about LPM's finances. Newell testified that Fassnacht suggested a scenario in which LPM, Inc. would say that it had entered into an agreement with Burke, for the payment to Burke of a finder's fee with respect to the investment work done for ADIA. (Tr. at 197-200.) The three individuals met several times in early 1996 to review false documents prepared by Fassnacht or Newell and to refine the details of their cover story.

There was evidence offered by the government that while the efforts to create a cover story began before the commencement of the grand jury investigation, once Fassnacht and Malanga became aware of the grand jury investigative efforts, they continued to rely on that cover story, making false statements to investigating agents and preparing false documents to back up their story.

First, there was sufficient evidence for the jury to have concluded that Fassnacht and Malanga were aware that a federal grand jury, and not just the IRS, was investigating

their tax affairs. Special Agent Lawrence Egan testified that he served Fassnacht with a subpoena from the grand jury on April 1, 1996. (Tr. at 763.) On April 2, Fassnacht was recorded in a telephone conversation with Newell discussing the documents requested in "the subpoena I received." (Tape Tr. 4/2/96 11:15 AM at 2.) Malanga was tape-recorded in an April 3 call with Newell discussing Fassnacht's postponed grand jury testimony. (Tape Tr. 4/3/96 5:30 PM at 5 & 13.) And when Newell was asked on direct examination whether the grand jury was mentioned during his April 23 meeting in Newark with Malanga and Fassnacht, Newell testified: "I believe it was." (Tr. at 287.)

There was also extensive evidence offered recounting Fassnacht's and Malanga's efforts to refine and maintain their cover story. For example, in an April 2 recorded telephone call between Newell and Fassnacht, Newell asked if Fassnacht was sticking with the finder's fee cover story: "Just, just so we don't uhh contradict each other or are you sticking one fee, the finder's fee." Fassnacht replied, "Yep, yep." (Tape Tr. 4/2/96 11:45 AM at 5.) Later in the April 2 Newell-Fassnacht phone call, Newell asked Fassnacht if he "want[ed] me to stick to the story, the finder's fee contract (inaudible) is in fact a valid contract." Fassnacht replied, "[A] verbal contract is fine. I provided you with draft basically of alternatives to use." (Tape Tr. 4/2/96 11:45 AM at 7.)

On April 13, Malanga was recorded in a telephone call with Newell, in which Newell said that it would "be nice to, you know, to know whether he's [Fassnacht] still proposing we stick with it, the Burke cover story." Malanga replied, "Well, I think that's the story . . . ." (Tape Tr. 4/13/96 5:20 PM at 8.) In a tape recorded telephone conversation between Newell and Malanga following an April 15 dinner meeting, Newell expressed concern with Fassnacht's statement that Burke would "set up just whatever cover story you guys want. All, all he asks is twenty percent." Malanga

replied, "Well he said ten percent really." (Tape Tr. 4/15/96 11:00 PM at 4.) In an April 18th call, Malanga asked Newell about his meeting with accountants earlier that day. Newell told Malanga twice that he "stuck to the story" and that the accountants asked to see any documents corroborating the story, "[l]ike the finder's fee agreement and any, any backup to, like invoices and stuff." Malanga's reply: "Ha, ha, tis a tangled web we weave." (Tape Tr. 4/18/96 9:08 PM at 4.)

The government also presented evidence that Fassnacht and Malanga participated in the creation of false documents to support their cover story. At the end of an April 18 call with Malanga, Newell suggested that they "put our, our case together, get whatever documentation uhh John [Fassnacht] or Ed [Burke] or whoever can get us and see how the story fits together." Malanga agreed: "All right." (Tape Tr. 4/18/96 9:08 PM at 6.) On April 19, Newell and Fassnacht had a telephone conversation in which Fassnacht assured Newell that he would get documentation to back up the finder's fee story. When Newell tells Fassnacht that "I've been sticking to our story," Fassnacht replies: "Good." (Tape Tr. 4/19/96 8:03 AM at 2.)

Newell testified at trial that at the April 23 meeting he had with Fassnacht and Malanga, held at the Admiral's Club at Newark Airport, Fassnacht produced "documents that had been prepared which evidenced a loan agreement between LPM, Limited, and Dr. Malanga, and that would be the rationale for the $400,000 payment in February [for Malanga's house]." Newell testified that Malanga signed the note and gave it back to Fassnacht. (Tr. at 274.)

Newell also testified that at the April 23 meeting, Fassnacht instructed him to "think through a script . . . which would in some logical fashion provide a story that would explain how Ed Burke introduced us to ADIA." Newell prepared such a chronology and later delivered it to Fassnacht. (Tr. at 276-77, 295.) Some time later, when IRS

agents executed a warrant authorizing the search of Fassnacht's belongs at JFK Airport prior to Fassnacht boarding a flight to Bermuda, the agents found the chronology prepared by Newell among Fassnacht's belongings; Fassnacht had promised to deliver the chronology/script to Burke. (Tr. at 820-21.)

Taking this evidence in the light most favorable to the government, as we must when reviewing the denial of a motion for judgment of acquittal, we believe that a jury could have rationally concluded that Fassnacht and Malanga intended that their conduct would have the "natural and probable effect" of impeding the investigation by the grand jury.

The evidence offered at trial—including Newell's testimony, the tape-recorded conversations, and other documentary evidence—indicated that after Fassnacht and Malanga became aware that a federal grand jury was involved in the investigation of their tax returns, they continued to stick with the finder's fee cover story, repeatedly making false statements to the IRS Criminal Investigation Division agents and creating fictitious documents to back up their false statements. References to the grand jury interspersed among the defendants' conversations in which they continued to refine their cover story provide a rational basis on which the jury could have concluded that the defendants were more than merely aware of the grand jury investigation, but that the grand jury was in fact an object of their obstructive efforts. In addition, even if it believed that the defendants' obstructive efforts were primarily aimed at the IRS agents, the jury was entitled to make the rational inference that Fassnacht and Malanga understood that the IRS agents were acting as the "arm of the grand jury," and that impeding the agents' efforts necessarily meant obstructing the grand jury. *See Aguilar*, 515 U.S. at 600.

To the extent that Fassnacht and Malanga argue that the evidence was insufficient because Newell's testimony at

trial was tainted because it was given under a grant of immunity, or because the recorded conversations were unreliable because "Newell was in a position in these calls to direct the conversation in order to advantage himself with the Government," those arguments go to the weight the jury should have given the evidence, something we are precluded from reviewing. We simply note that the evidence presented at trial does in fact provide a basis for the jury's verdict. A rational jury could have found the requisite "nexus" between the statements and actions of the defendants and the grand jury's work—one could certainly posit "a relationship in time, causation, or logic with the judicial proceedings." *Aguilar*, 515 U.S. at 599.

In sum, we believe that it was rational for the jury to have concluded that "in the defendant[s'] mind[s]," their adherence to the fictitious explanation for the diversion of the incentive fee to the offshore account would have "the 'natural and probable effect' of obstructing or interfering with" the grand jury. *Schwarz*, 283 F.3d at 109 (citing *Aguilar*, 515 U.S. at 599). We therefore reject the defendants' contention that there was insufficient evidence presented at trial for a rational jury to have reached guilty verdicts on the § 1503 charges. The district court's decision to deny the defendants' motion for a judgment of acquittal was correct.

## CONCLUSION

For the foregoing reasons, we uphold the guilty verdicts reached by the jury. The convictions of both Fassnacht and Malanga are AFFIRMED.

A true Copy:
    Teste:

                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*