In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2691

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MELVIN R. THOMAS, also known as
MELVIN R. THOMPSON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:12-cr-00155-wmc-1 — **William M. Conley**, *Chief Judge.*

ARGUED SEPTEMBER 16, 2016 — DECIDED JANUARY 10, 2017

Before POSNER, RIPPLE, and ROVNER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Melvin Thomas was indicted by a
grand jury on one count of conspiracy to possess, with intent
to distribute, a mixture or substance containing heroin, in vi-
olation of 21 U.S.C. §§ 841(a)(1), 846; and two counts of pos-
sessing, with intent to distribute, a mixture or substance con-
taining heroin, in violation of 21 U.S.C. § 841(a)(1). He
pleaded not guilty, and the case proceeded to trial. At the end

of the Government's case, Mr. Thomas moved for a judgment of acquittal. The district court denied the motion. A jury later found Mr. Thomas guilty of the charged offenses, and the court subsequently sentenced him to 216 months' imprisonment. Mr. Thomas timely appealed. He now challenges the sufficiency of the evidence to support his conspiracy conviction. He also maintains that the district court erred in imposing a sentencing enhancement for maintaining a drug house.

We conclude that there is sufficient evidence to sustain the conspiracy charge and that the evidence supports the district court's imposition of the sentencing enhancement. Accordingly, we affirm the judgment of the district court.

# I

## BACKGROUND

While investigating a heroin dealer named Domingo Blount, Drug Enforcement Agency ("DEA") agents intercepted, through a court-authorized wiretap, Blount's incoming and outgoing telephone calls. Among the intercepted calls were twenty-nine calls from Blount's number to Mr. Thomas. Discovery of these calls eventually led to the DEA's investigating Mr. Thomas's activities. Through subsequent surveillance, the agents in Chicago observed several meetings between Blount and Mr. Thomas.

On November 9, 2010, the DEA learned that Mr. Thomas was traveling back to Wisconsin from Chicago and that he was carrying heroin. Madison police officers conducted a traffic stop of the vehicle. Anita Andrews was the driver; Mr. Thomas was the passenger. The officers searched the car and patted Andrews down, but did not find any contraband

and therefore allowed the car to proceed. Andrews later testified that the officers had failed to detect any drugs because she had concealed them in her genital area.

On December 10, 2010, officers stopped another vehicle arriving in Madison from Chicago. Porcha Bell was driving; Mr. Thomas was the passenger. When questioned, Bell admitted that, at Mr. Thomas's request, she was concealing twenty-five grams of heroin in her vagina. She said that she had acquiesced to his request because Mr. Thomas had promised to buy her children Christmas presents and because she had feared that Mr. Thomas would leave her in Chicago if she refused. During this encounter, Mr. Thomas was arrested on a Wisconsin probation hold.

Shortly thereafter, agents conducted a consent search at Andrews's home. During the course of that search, the agents found a digital scale, a chemical substance used to cut or mix drugs,[1] and twenty-two sandwich baggies with the corners cut out.[2] After seizing these items and questioning both Andrews and two other adults then present in the home, the officers left.

Later that morning, agents listened to Mr. Thomas's post-arrest jail calls. Mr. Thomas's first call was to his mother. In this phone call, Mr. Thomas asked his mother to call Andrews

---

[1] Officers found Inositol, a substance often used as a cutting agent with cocaine and heroin. Appellant's Br. 6; *see* R.244 at 185–86.

[2] Detective Dorothy Rietzler explained that the cut corners were significant because drug dealers will "put the substance into the corner [of the] baggie, subsequently knot it off … and then that corner is cut [out]." R.248 at 55. This allows dealers to use one sandwich bag to package two units of product.

and to tell her to get rid of his "stash" and to get the cash out of the Cadillac that he had parked at her residence. Based on this call, agents seized the automobile. They found approximately $2,460 in the glove box of the car. No drugs were found.

Based on this evidence, Mr. Thomas was indicted by a grand jury on one count of conspiracy to possess, with intent to distribute, a mixture or substance containing heroin; and two counts of possessing, with intent to distribute, a mixture or substance containing heroin. A three-day jury trial commenced on May 18, 2015.[3] Andrews testified for the Government. In addition to the encounters already described, she testified that she had driven Mr. Thomas to Chicago on several occasions. After purchasing the heroin, the pair would return to Madison and either stop at the home of Mr. Thomas's mother or drive directly to Andrews's house. Testifying about the November 10, 2010 stop, Andrews stated that, during this stop, she had concealed heroin in her genital area because Mr. Thomas had told her to "[d]o this or I'll knock you the f--k out."[4]

After the November 10 stop, Andrews's relationship with Mr. Thomas soured. Andrews testified that she rarely saw Mr. Thomas after their breakup, although Mr. Thomas still kept personal items at her home. At trial, Andrews described Mr. Thomas as having "items there, but he was not—he was gone

---

[3] The district court's jurisdiction was predicated on 18 U.S.C. § 3231.

[4] R.244 at 168.

all the time. I barely saw him."[5] When Mr. Thomas later testified, he also described the relationship as rocky.

Two law enforcement officers also testified at trial. A DEA agent, Terrence Glynn, discussed the wiretap on Blount's phone and conversations involving Mr. Thomas. Detective Dorothy Rietzler of the Madison Police Department testified about the December 10, 2010 stop. Mr. Thomas does not dispute this testimony.

At the conclusion of the Government's case, Mr. Thomas moved for a judgment of acquittal. The district court denied the motion stating, "I think the circumstantial evidence as such is so strong that I'm going to allow the case to proceed, although you've preserved your record and you can make what arguments you wish at the appropriate time in more detail."[6]

The defense then called two witnesses: Porcha Bell and Mr. Thomas himself. Bell was subpoenaed to appear by both the Government and the defense at trial, but did not show up.[7] However, the district court allowed defense counsel to play a recording of her testimony at Mr. Thomas's state probation revocation proceedings.[8] There, Bell recounted her version of the events of December 10, 2010, including that she

---

[5] *Id.* at 169.

[6] R.248 at 157.

[7] *Id.* at 135–37.

[8] *Id.* at 218–19.

had concealed drugs in her genital area at Mr. Thomas's request.[9]

Mr. Thomas also took the stand. He offered a different explanation for his contact with Blount and his interaction with Bell. According to Mr. Thomas, he was purchasing medicinal marijuana, not heroin, from Blount.[10] He admitted that he communicated with Blount, via text messages and telephone calls, but testified that those communications, which included references to selling drugs on "corners," were referring only to marijuana and that Andrews did not help him with these sales.[11] Mr. Thomas also testified that his relationship with Andrews was rocky because they were cheating on each other.[12]

Mr. Thomas also offered a wholly different explanation for his interaction with Bell on December 10. According to Mr. Thomas,

> I was at—I had went to a party over in the Castille area and later that night my cousin Matt and Porcha Bell had showed up at this party. Matt had ended up going home with a chick, a female that he messing with, so I had ended up getting the van from him. And a little later after that, I had—I was getting ready to go home and Porcha Bell had asked me to drop her off and I

---

[9] *See* R.202 at 7.

[10] R.248 at 180–81.

[11] *Id.* at 182, 185.

[12] *Id.* at 168.

> told Porcha Bell that since we both were heading in the same direction, on the east side, I told Porcha Bell that I would drop her off on the conditions that she drive to her destination and then I would drive home from there, which was to my house, Anita—me and Anita's house. Because I didn't want to drive because I had like four driving traffic tickets that I had owed money on.
>
> I asked Porcha Bell did she have a driver's license and she told me yeah. So I let her drive. On my way home, she got off the beltline on Stoughton over on Pflaum Road and she didn't have—she was driving without the headlights on, so we ended up getting pulled over for a traffic stop.[13]

Mr. Thomas asserted that he was unaware of the drugs in Bell's possession. He "believe[d] that Detective Rietzler coerced her to say that those narcotics belong[ed] to [him] during the traffic stop."[14]

The jury later found Mr. Thomas guilty on all counts, and, specifically determined that the conspiracy involved 100 grams or more of heroin.[15]

---

[13] *Id.* at 170–71.

[14] *Id.* at 175.

[15] R.249 at 65–66.

The presentence report ("PSR") recommended a two-level enhancement under U.S.S.G. § 2D1.1(b)(12) for maintaining a drug house.[16] It further advised that Mr. Thomas qualified as a career offender under § 4B1.1(b)(1) because of his four prior felony convictions for controlled substance offenses.[17] Mr. Thomas did not file written objections to the PSR, but at the sentencing hearing his counsel "maintain[ed] [Mr. Thomas's] innocence and object[ed] to the factual portions and the full report."[18]

The district court concluded that, because of the four prior felony controlled substance offenses, Mr. Thomas was a career offender. This determination resulted in an advisory guideline imprisonment range of 360 months to life. The court decided to impose a sentence of 216 months' imprisonment. Mr. Thomas timely filed this appeal.[19]

## II

## DISCUSSION

### A.

Mr. Thomas first submits that the district court erred in denying his motion for a judgment of acquittal. He maintains that the record contains insufficient evidence to support his conspiracy conviction.

---

[16] R.202 at 14.

[17] *Id.* at 15.

[18] R.246 at 3.

[19] Our jurisdiction is predicated on 28 U.S.C. § 1291.

We review de novo the district court's denial of the motion for judgment of acquittal. *United States v. Fassnacht*, 332 F.3d 440, 447 (7th Cir. 2003). In reviewing the district court's decision, we must assess "the evidentiary basis for the jury's verdict in the light most favorable to the government." *Id.* (internal quotation marks omitted). We will uphold the conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Granados*, 142 F.3d 1016, 1019 (7th Cir. 1998) (internal quotation marks omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We will overturn the jury's verdict only when the record is "devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Campbell*, 770 F.3d 556, 568 (7th Cir. 2014). A defendant challenging the sufficiency of the evidence against him therefore "faces a formidable burden." *United States v. Goree*, 756 F.3d 522, 525 (7th Cir. 2014) (internal quotation marks omitted).

Mr. Thomas contends that the Government "failed to prove he had any coconspirators."[20] The Government maintains, however, that Andrews was Mr. Thomas's coconspirator. Mr. Thomas counters that Andrews's participation does not rise to the level of conspiratorial conduct because: (1) she did not knowingly agree with Mr. Thomas; and (2) she did not receive any payment or consideration for her role.

To convict a defendant on a conspiracy charge, the Government must prove that "(1) two or more people agreed to commit an unlawful act, and (2) the defendant knowingly and intentionally joined in the agreement." *United States v.*

---

[20] Appellant's Br. 17.

*Vaughn*, 722 F.3d 918, 928 (7th Cir. 2013). Specifically, a drug-distribution conspiracy charged under 21 U.S.C. § 846 "requires proof that the defendant knowingly agreed—either implicitly or explicitly—with someone else to distribute drugs." *United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010). Although an agreement is sometimes express, an assessment of circumstantial evidence is frequently necessary. *United States v. Pulgar*, 789 F.3d 807, 813 (7th Cir. 2015). "Importantly, there is no rigid list or formula to prove a conspiracy in the absence of an express agreement." *Id.*; *United States v. Brown*, 726 F.3d 993, 1002 (7th Cir. 2013) ("[O]ur list of example considerations may make it sound as if we are checking off boxes and only looking for specified indicia. That is not the case."). The court must undertake a fact-specific inquiry. In short, we employ a totality-of-the-circumstances approach and "take into account all the evidence surrounding the alleged conspiracy and make a holistic assessment of whether the jury reached a reasonable verdict." *Brown*, 726 F.3d at 1002.

An examination of the record makes clear that the jury was entitled to conclude that Andrews was a knowing coconspirator. She drove Mr. Thomas to and from Chicago to buy heroin from Blount; by doing so she clearly assisted in accomplishing the objective of the conspiracy. She also rented vehicles for the trips. Indeed, Andrews testified that she drove Mr. Thomas to locations to make drug deliveries.[21] On at least one occasion, Andrews packaged heroin for Mr. Thomas when he called her and said, "Hurry up, I need to you do [sic] something for me."[22] Even if Mr. Thomas was angry when this request was

---

[21] R.244 at 179–80.

[22] Appellant's Br. 6; R.244 at 178.

made, that does not overcome the fact that "the jury could have easily concluded" that both parties "embraced the conspiracy's objectives." *United States v. James*, 540 F.3d 702, 708 (7th Cir. 2008).

Mr. Thomas also submits that Andrews cannot be a coconspirator because she did not gain any benefit for her role. But "[a] criminal without a profit motive is still a criminal as long as all elements of the crime are established." *United States v. Hunte*, 196 F.3d 687, 691 (7th Cir. 1999). We already have determined that a jury could have concluded reasonably that Andrews was a coconspirator; any lack of profit does not alter that status.

## B.

Mr. Thomas also maintains that the district court erred in imposing a sentencing enhancement for maintaining a drug house.

We first must address whether Mr. Thomas adequately raised the challenge to the PSR's recommendation that this enhancement be imposed. If he did, we will review the district court's application of the sentencing guidelines *de novo* and its factual findings under the clearly erroneous standard. *United States v. Bennett*, 461 F.3d 910, 912 (7th Cir. 2006). If he did not object sufficiently, we will review for plain error. *United States v. Seals*, 813 F.3d 1038, 1044–45 (7th Cir. 2016).

An examination of the record reveals that, at sentencing, Mr. Thomas maintained his innocence and objected to the

"full report."[23] He made no specific objection with respect to this enhancement. He now maintains that this general objection was sufficient to preserve the issue on appeal. The Government counters that the general objection was insufficient notice of Mr. Thomas's specific challenge to the drug house enhancement.

The Government is correct. Precedent and strong policy reasons support its position.[24] "It is now axiomatic that in order '[t]o preserve an issue for appellate review, a party must make a proper objection at trial that alerts the court and opposing party to the specific grounds for the objection.'" *United States v. Hardamon*, 188 F.3d 843, 848 (7th Cir. 1999) (alteration in original) (internal quotation marks omitted) (quoting *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998)); *see also United States v. Neal*, 578 F.3d 270, 272–73 (5th Cir. 2009). Thus, a party may not rest on a general objection to the evidence; "absent a proper, specific and timely objection … we will only review for plain error." *Hardamon*, 188 F.3d at 849.

On plain error review, we may reverse the district court's findings only when: "(1) [an] error occurred; (2) the error was 'plain'; (3) and the error affected the defendant's substantial rights." *United States v. Corona-Gonzalez*, 628 F.3d 336, 340 (7th Cir. 2010) (alteration in original) (internal quotation marks omitted) (citing *United States v. Olano*, 507 U.S. 725, 731–36

---

[23] R.246 at 3.

[24] *See, e.g.*, *Puckett v. United States*, 556 U.S. 129, 134 (2009) ("This limitation on appellate-court authority serves to induce the timely raising of claims and objections, which gives the district court the opportunity to consider and resolve them. That court is ordinarily in the best position to determine the relevant facts and adjudicate the dispute.").

(1993)). If these criteria are met, we may exercise our discretion and reverse the judgment if we determine that the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732 (internal quotation marks omitted).

We need address only the first prong of this test because no error occurred. The Sentencing Guidelines provide for this two-level enhancement where "the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12). Application Note 17 explains:

> Among the factors the court should consider in determining whether the defendant "maintained" the premises are (A) whether the defendant held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises.
>
> Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

U.S.S.G. § 2D1.1 n.17. Mr. Thomas submits that the en-
hancement is inapplicable to him because he did not have
a possessory interest over Andrews's home and because
housing his drug operation was not the home's primary
purpose.

We cannot accept these arguments. The enhancement does
not require either ownership or a leasehold interest. *United
States v. Flores-Olague*, 717 F.3d 526, 532 (7th Cir. 2013).[25] An
ownership interest is but one consideration. As Mr. Thomas
admits, another consideration is whether "the defendant lives
in the house."[26] The record certainly supports the district
court's finding that he resided with Andrews.[27] As
Mr. Thomas admits, and Andrews's testimony corroborates,[28]
he "moved into Andrews's apartment in Madison, Wisconsin
about two to three months after their relationship began and
he lived off and on at this location" until December 2010.[29]

---

[25] *See also United States v. Carter*, 834 F.3d 259, 262–63 (3d Cir. 2016) ("[T]he
absence of [the defendant's] name on a deed or lease is insufficient to pre-
clude the enhancement's application."); *United States v. Jones*, 778 F.3d 375,
385 (1st Cir. 2015) (citing *United States v. Renteria-Saldana*, 755 F.3d 856,
859–60 (8th Cir. 2014)).

[26] Appellant's Br. 30 (quoting *United States v. Russell*, 595 F.3d 633, 645 (6th
Cir. 2010)).

[27] R.246 at 5–6.

[28] R.244 at 156 (stating, for example, Mr. Thomas moved in "[v]ery
quickly").

[29] Appellant's Br. 4.

Even though Andrews testified that she "barely saw" Mr. Thomas after the November 2010 traffic stop,[30] this factor alone does not prevent a finding that Mr. Thomas lived in the home. It is uncontested that Mr. Thomas kept personal items at Andrews's home at least until the December 2010 search.[31] Mr. Thomas's December 2010 jail call to his mother is, moreover, particularly persuasive on the ultimate issue. In that call, Mr. Thomas specifically referred to "stash spots" in Andrews's home, as well as a car of his parked at Andrews's residence, which contained a large quantity of cash.[32] A reasonable factfinder could easily conclude that Mr. Thomas maintained a connection to the home at the time of these calls. There would be no reason otherwise for Mr. Thomas to ask his mother to have Andrews check the home for his "stash."[33]

Mr. Thomas's use of the home as part of his scheme was part of the home's "primary purpose." We reviewed a similar issue in *United States v. Sanchez*, 810 F.3d 494 (7th Cir. 2016). In *Sanchez*, defense counsel similarly argued that the

---

[30] R.244 at 169.

[31] Appellant's Br. 6–7; R.244 at 169–70. Mr. Thomas also testified that Bell was driving him to "[his] and Anita [Andrews]'s house" when they were pulled over, implying that he was still residing at Andrews's home on December 10, 2010. R.248 at 171.

[32] *Id.* at 187–88, 200. Mr. Thomas admits that this call took place, but disputes whether we can infer that drugs were still at the home, since, when the police returned to Andrews's residence for the second search, they did not find heroin. Appellant's Br. 32. The district court's determination, however, is supported by evidence of the phone call.

[33] R.248 at 58–59, 187–88.

§ 2D1.1(b)(12) enhancement should not apply because the primary purpose of Sanchez's residence was not drug distribution. Defense counsel emphasized that:

> in other cases the "primary purpose" requirement of the guideline was met by additional facts, such as when the defendants also "maintained business records, used a child to deliver narcotics, settled financial transactions or accepted payment" on the premises. [Defense counsel argued that] Sanchez, however, was merely providing storage and this was not enough to make drug distribution the primary purpose of his house.

*Id.* at 496. We disagreed and affirmed the district court's finding that storing drugs was one of the home's primary purposes. We explained: "a premise can have more than one primary use (drug distribution and residence), and, as long as it is more than 'incidental or collateral,' drug distribution does not have to be the 'sole purpose.'" *Id.* at 497.[34] We also noted that storing additional tools of the drug-trafficking trade can

---

[34] *See also United States v. Flores-Olague*, 717 F.3d 526, 531–32 (7th Cir. 2013) (holding the enhancement was applicable when defendant stored cocaine on the premises for several years, sold it to at least ten regular customers, and had firearms in the home); *see also United States v. Bell*, 766 F.3d 634, 638 (6th Cir. 2014) ("Drug storage on the property and transactions on the property will usually suffice [to establish primary use.]"); *United States v. Miller*, 698 F.3d 699, 706–07 (8th Cir. 2012) (applying enhancement when coconspirator was involved in at least three transactions at the home, used her son to deliver drugs to one of the buyers, and collected payment for drugs on several occasions).

be "indicia that drug trafficking was the principal use of the premises." *Id.* (quoting *Flores-Olague*, 717 F.3d at 533).

The district court certainly did not commit plain error. Mr. Thomas admits that Andrews testified that Mr. Thomas "cut[] and packag[ed] heroin in her home," though she only witnessed it on one occasion.[35] Andrews also admitted that "she packaged heroin for Mr. Thomas one time" in her home upon his insistence.[36] Even if "no drug sales ever occurred at her residence,"[37] Andrews also testified to her belief that her television console was being used to store drugs.[38] Additionally, the December 2010 search of the home yielded a digital scale, a cutting agent, and plastic sandwich baggies with the corners cut out.[39] These tools of the trade are "indicia that drug trafficking was the principal use of the premises." *Sanchez*, 810 F.3d at 497 (internal quotation marks omitted).

The district court's finding was further supported by another witness's statements in the PSR. Trina Harr, who lived with Mr. Thomas and Andrews for a period of time and was present when police searched Andrews's home,[40] stated that

---

[35] Appellant's Br. 4.

[36] *Id.*

[37] *Id.* at 5.

[38] *Id.* at 4.

[39] R.248 at 54–56; *see supra* note 2.

[40] It is unclear how long Harr lived with Mr. Thomas and Andrews, however, Mr. Thomas admitted that Harr lived with them around the time of his arrest in December 2010. R.248 at 173–74.

she had observed Mr. Thomas cutting up heroin approximately seven to eight times at Andrews's home. Although she did not testify at trial, Harr told investigators that she had seen heroin in the house and that she observed Mr. Thomas mixing or cutting the heroin and packaging the heroin into sandwich bags for sale at the home. Harr also saw Mr. Thomas retrieve a scale from the downstairs closet of the home on numerous occasions.[41] It therefore was appropriate to apply the enhancement.

## Conclusion

The district court's opinion is affirmed. There was sufficient evidence to support a finding that Mr. Thomas conspired with Andrews. The court also did not err in imposing a two-level sentencing enhancement for maintaining a drug house; the record supports a finding that Mr. Thomas lived in Andrews's home and used that home as part of his distribution process.

AFFIRMED

---

[41] R.202 at 11.